Charles **B. WRIGHTSMAN** and Jayne Wrightsman

v.

The **UNITED STATES.**

No. 364–66.

United States Court of Claims.
July 15, 1970.

Hugh F. Culverhouse, Jacksonville, Fla., attorney of record, and W. A. Gartner, Jacksonville, Fla., for plaintiffs.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen., Johnnie M. Walters, for defendant. Philip R. Miller and Mark Segal, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION *

LARAMORE, Judge.

This is an action to recover alleged overpayments of Federal income taxes paid by plaintiffs for tax years 1960 and 1961 in the amounts of $5,911.20 and $21,199.78, respectively, plus assessed interest in the respective amounts of $1,847.25 and $5,352.22, plus statutory interest on the amounts of recovery. The issue before us involves the deductibility under section 212 of the 1954 Internal Revenue Code [1] of certain expenses incurred by plaintiffs with respect to their art collection. Deductibility of such expenses under section 212, in turn, depends upon whether plaintiffs collected the pertinent works of art primarily as investments or, instead, primarily for their personal pleasure and enjoyment.[2] We hold that plaintiffs have failed to establish that their art collection was primarily investment-motivated and, therefore, they are not entitled to recover.

Plaintiffs, Charles B. Wrightsman and Jayne Wrightsman, were married in 1944.[3] For the tax years here involved, 1960 and 1961, the Wrightsmans filed joint Federal income tax returns. Plaintiffs have both participated in the activities incident to the acquisition and maintenance of their art collection. The Wrightsmans' acquisition of works of art commenced in 1947 when, they have conceded, their activities were in the nature of a hobby. In that initial year, plaintiffs' expenditures for art objects amounted to $3,741. By the end of 1960, their purchases totaled $5.2 million and, by the end of 1961, $300,000 more. As of March 31, 1967, plaintiffs' total purchases of works of art exceeded $8.9 million; the works of art were valued for insurance purposes in excess if $16.8 million.

Mr. Wrightsman had great skepticism with regard to conventional investments in the stock market, an attitude which stemmed from experiences during his youth in observing his father's disastrous investments in securities. One investment, however, in which Charles was able to combine knowledge and management control, two factors which he considered requisite to any investment success, was in the Standard Oil Company of Kansas. In 1918, after active service in the United States Navy, Charles moved to Fort Worth, Texas, where he engaged in the oil business as a lease broker and in several oil ventures. He accumulated sufficient funds by 1930 to purchase, and did purchase at private sale, the shares of the largest stockholder of Standard Oil Company of Kansas. He was then elected to the board of directors and, in 1932, became president of that company. He held such office through January 1951, when liquidation of that company, which had commenced in 1949, was concluded. At this time, Charles owned 93.7 percent of the outstanding stock.

Upon the liquidation, Mr. Wrightsman received a 93.7 percent interest in all of the properties, including one million dollars in cash distributed to him. With the removal of the corporate structure, his financial position changed from stock ownership to direct ownership of oil-producing properties, which he has continued to operate as an individual un-

---

* We are indebted to Trial Commissioner Roald A. Hogenson for his findings of fact, which have been adopted in their near entirety, and for his recommended opinion, though we have substituted our own in reaching a different result.

1. All citations to Code sections hereinafter are, unless otherwise indicated, in reference to the Internal Revenue Code of 1954.

2. Also involved in this suit is plaintiffs' claim of entitlement to deduction of $1,000 as part of a capital loss sustained on their sale in 1961 of certain works of art. Defendant has conceded that plaintiffs are entitled to recover in this regard *if* it be determined they were investors in their works of art.

3. For convenience, Mr. and Mrs. Wrightsman will hereinafter sometimes be referred to individually as Charles and Jayne, respectively.

der appropriate arrangements with the owners of the 6.3 percent interests. Thus, he commenced and has continued to receive directly a large cash flow, which had previously gone into the corporate coffers.

Aside from his investments in Standard Oil of Kansas, Mr. Wrightsman's ownership of stock, as well as that of Mrs. Wrightsman, has been quite limited. In 1959, Wrightsman Investment Company was organized, with Mr. Wrightsman as the sole stockholder, owning minor Oklahoma oil properties contributed by Charles, land on which plaintiffs' Palm Beach, Florida, home is located, and limited assets previously owned by Charles in New Mexico, Mississippi and Nebraska. Plaintiffs acquired 1,583 shares of Wrightsman Petroleum Company in 1960 and 1961, a company which had been organized by Charles' father. At the time of the trial of this case, Mrs. Wrightsman was the beneficial owner of a trust for which a bank, as trustee, had purchased stock.

Mr. Wrightsman believed that oil was one of the best possible investments, if selectively made. His trips to the Persian Gulf countries in the mid-1950's indicated to him, however, that there was a possibility of an oil glut, which caused him to conclude that he should make an effort to hedge his investments in oil with investments of other kinds. He sought advice from qualified employees. The certified public accountant in charge of his accounts recommended purchase of unimproved real estate and stock in corporations not in the oil industry. These recommendations were not followed.

By this time, Mr. Wrightsman had formed the belief that works of art were an excellent hedge against inflation and devaluation of currencies, that they represented portable international currency, since there were no restrictions on export from the United States, and that works of art were appropriate assets for investment of a substantial portion of his surplus cash being generated. These beliefs and investment intent were expressed to numerous friends and associates and the employees of his business office.

Mrs. Wrightsman's assets have been derived from income through Mr. Wrightsman under community property laws and from funds received from Charles in the form of gifts. Jayne fully shared Charles' beliefs and intent concerning investment in works of art. Their marriage has been one of constant association and travel together, with common interests and goals.

In their art collecting activities, plaintiffs have specialized in the acquisition of 18th century French works of art. Mrs. Wrightsman is not just a nominal party herein because of the filing of joint returns by the parties. She owns about three-fourths of plaintiffs' works of art, either by number or by value. Their activities in the acquisition and holding of such works of art have been conducted jointly.

Plaintiffs' mode of living from 1947 to the present time has been to reside from the latter part of November until late April at their home in Palm Beach, Florida, with occasional trips to New York City or elsewhere. Commencing about the first of May, they live for about 30 days in New York City, staying since 1956 in their Fifth Avenue apartment. From June 1 to the end of September or early October, they are in Europe, where they live exclusively in hotels.

The Wrightsmans have constantly associated with well known experts in the art world. They are art experts in their own right, as recognized by others, particularly in the testimony of Mr. Francis J. B. Watson, Surveyor of the Queen's Works of Art and Director of the Wallace Collection of London, and Mr. Joseph V. Noble, Vice Director for Administration of the Metropolitan Museum of Art.

In the acquisition by plaintiffs of works or art, each art object has been invoiced, assigned an inventory number,

and noted as an approved purchase by one of the plaintiffs. The invoice is sent directly to plaintiffs' Houston, Texas, business office for payment. There the approved invoice is checked for accuracy, and a check request is prepared, following the usual business procedures employed in Mr. Wrightsman's investments in oil and gas properties. The check request, a copy of the check, and a copy of the original invoice are retained in the Houston office file. The original invoice, marked paid, with date and check reference, is returned to plaintiffs' personal files, which follow them from the Palm Beach home to their New York apartment, as the occasion warrants. Each item is reflected in the investment control account of the general ledger maintained in the Houston office. A detailed investment card record is kept with respect to each item in the works of art collection. On each card is noted the original purchase price, the date of purchase, and any items deemed to be of a capital nature requiring capitalization on the investment books of plaintiffs.

Plaintiffs have consistently catalogued their purchase of works of art. At the time of the trial herein, these catalogues consisted of 26 three-ring binder volumes, requiring a shelf space of about five feet. These catalogues are unique, represent 20 years of work by Mrs. Wrightsman, and have considerable value. Partially on the basis of this extensive cataloguing, the Metropolitan Museum has published two volumes and is in the process of completing the publication of a five-volume work on the Wrightsman Collection, authorized by Mr. Francis J. B. Watson, which will be a treatise on 18th century French works of art.

On their Federal income tax returns for the years 1960 and 1961, plaintiffs claimed deductions for certain ordinary and necessary expenses incurred in the management, conservation and maintenance of investment properties, i. e., works of art, held by them for the production of income, and incurred in the production and collection of income from those properties. These expenses, which were incurred in connection with, and are directly attributable to, plaintiffs' works or art, represent costs of insurance, maintenance, subscriptions and services, shipping, hotel, travel, entertainment and other miscellaneous expenses. Plaintiffs also claimed as deductions on their 1961 return the alleged cost of acquiring and subsequently releasing a painting due to the inability to obtain an export permit, and part of an alleged capital loss sustained on the sale of certain works of art. Disallowance by the Internal Revenue Service of the claimed deductions, and denial of plaintiffs' claims for refund of the paid deficiencies issuing therefrom, gave rise to this suit.

Plaintiffs assert that the facts and circumstances in evidence, with which they say their personal declarations of purpose and intent are in complete accord, clearly establish the deductibility of the incurred expenses as primarily investment-motivated. Defendant responds that because of the nature of the properties involved, plaintiffs are entitled to deduct the subject expenses *only* by showing a physical segregation of the works of art which precludes personal pleasure; a showing which, defendant contends, plaintiffs have failed to make. In the alternative, defendant opposes any recovery here on the ground that plaintiffs have not shown any action on their part inconsistent with the holding of their collection for pleasure, and have thereby failed to satisfy their burden of proof that the pertinent expenses were incurred primarily for an investment purpose. Although we hold that plaintiffs are not entitled to recover, neither of the alternative theories advanced by defendant constitutes, in our view, the proper application of the apposite legal standard upon which we premise our holding.

Section 212 provides, in parts pertinent to this suit:

In the case of an individual, there shall be allowed as a deduction all the

ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income;

(2) for the management, conservation, or maintenance of property held for the production of income; or

\* \* \* \* \* \*

Treasury Regulations on income tax, section 1.212–1(c) imparts, moreover, with respect to the deductible investment expense, nondeductible personal expense [4] dichotomy and the apposite standard for proper classification:

Expenses of carrying on transactions which \* \* \* are not carried on for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income, but which are carried on *primarily* as a sport, hobby, or recreation are not allowable as nontrade or nonbusiness expenses. The question whether or not a transaction is carried on *primarily* for the production of income or for the management, conservation, or maintenance of property held for the production or collection of income, rather than *primarily* as a sport, hobby, or recreation, is *not to be determined solely from the intention of the taxpayer but rather from all the circumstances of the case.* [Emphasis supplied.]

■ It is clear from the above that the burden of proof which plaintiffs ·must satisfy if they are to prevail is that as a factual matter, from an objective view of the operative circumstances in suit, they acquired and held works of art dur-· ing the years here involved primarily for investment, rather than for personal

use and enjoyment. Plaintiffs must establish that their investment purpose for acquiring and holding works of art was "principal," or "of first importance." *See,* Malat v. Riddell, 383 U.S. 569, 572, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966).[5] And, they must establish this notwithstanding the pleasure-giving quality commonly recognized as inherent in art objects.

The perplexing nature of the issue in suit apparently has caused defendant to seek a narrow rule possessing ease of application and certainty of result. We are unaware of any authority, however, for the interpretations which defendant places upon the applicable legal standard. Those cases cited by defendant with respect to its physical segregation-pleasure preclusion standard do not, in our view, support the interpretation urged. *See,* R. Foster Reynolds, 4 TCM 837 (1945); George F. Tyler, 6 TCM 275 (1947); Juliet P. Hamilton, 25 B. T.A. 1317 (1932). Neither do they support defendant's alternative position which turns upon whether there was action on the part of the Wrightsmans inconsistent with the holding of their art collection for pleasure. We prefer to resolve the instant controversy by the more conventional application of the legal standard involved, namely, an analysis of the particular facts and circumstances, and a determination as to plaintiffs' primary purpose therefrom. A careful review of the entire record with this conventioanl approach in mind indicates, we think, that plaintiffs have failed to sustain their burden..

Plaintiffs have carefully marshaled a broad array of evidence in support of their declared investment purpose. In this regard, we have no reason to doubt

4. Section 262 provides as follows:
   "Except as otherwise expressly provided in this chapter, no deduction shall be allowed for personal, living, or family expenses."

5. The Supreme Court stated in Malat v. Riddell, *supra*, at page 572, 86 S.Ct. at page 1032:

" \* \* \* We hold that, as used in § 1221(1), 'primarily' means 'of first importance' or 'principally'."
Although the Court was addressing itself to a capital gain provision, we are of the opinion that its definition of the term "primarily" for tax purposes is equally applicable to, and most appropriate in, the context in which the term is here encountered.

that Mr. Wrightsman was wary of the more traditional forms of investment, or that he recognized an investment-aspect incident to the acquisition and retention of works of art. Indeed, the greatly increased current value of the Wrightsman collection would seem, at least in retrospect, to confirm the financial wisdom of plaintiffs' purchases. Nor do we doubt that meticulous bookkeeping detail was observed by plaintiffs with respect to the purchase, care, and maintenance of their collection, or that the Wrightsmans devoted considerable time and effort to their collection activities. We fully appreciate, moreover, that because of plaintiffs' mode of living, much of their time was spent away from their residences wherein the majority of their works of art were maintained. It is our judgment, however, that this evidence, when viewed in proper relationship to the additional evidence below, relegates investment intent to a position of something less than primary among plaintiffs' purposes for acquiring and holding works of art.

It may fairly be said, and the record so indicates, that plaintiffs' personal lives revolve around their art collection and related collecting activities. The Wrightsmans, without any prior formal education with respect to works of art, have since the late 1940's consistently and diligently pursued a course of self-education in that field, visiting major museums and art dealer establishments in the United States and overseas, studying works of art themselves, reviewing auction catalogues and price lists, and engaging in discussions with recognized art experts, such as collectors, museum curators, dealers and others knowledgeable in the world art community. They have reviewed all of the leading art periodicals, and engaged in extensive reading in their chosen field of 18th century French art and related areas. They have acquired a substantial art library, and Jayne has engaged in extensive research, while Charles has concentrated on the restoration and conservation of art objects and the conditions of the art

market. Jayne has educated herself in the use of the French language, to be qualified to engage in discussions and reading of materials in that language concerning 18th century French furniture and works of art. Whether in Palm Beach, New York, or abroad, the major portion of the Wrightsmans' day-to-day activities throughout each year is devoted to studying works of art. And, the Wrightsmans' social life in Palm Beach, New York, or abroad involves principally people knowledgeable and interested in the field of art.

As to the place and manner in which the Wrightsmans have held their collection, the record reveals that, except for occasional displays of items at other locations, plaintiffs have kept their works of art in their New York apartment, their Palm Beach home, and in the Metropolitan Museum on loan for display by that institution. As of March 31, 1967, about 77.8 percent of such objects (on an insurance evaluation basis) was in the New York apartment, about 17.7 percent in the Palm Beach home, and about 4.5 percent in the Metropolitan Museum. The works of art are on display, or in use as in the case of such items as French period furniture, in the New York apartment and the Palm Beach home, except that a small amount of furniture is stored in one room at Palm Beach.

Plaintiffs have provided air conditioning and humidity controls, considered necessary for the preservation of works of art, similar to those employed in the Metropolitan Museum. In this respect, the New York apartment is better equipped, accounting for the concentration of works of art there. Such apartment occupies the entire third floor of the building. Storage facilities for works of art have not been readily available to provide the required atmospheric controls especially needed for paintings and furniture.

The record also reveals extensive personal use by the Wrightsmans of various parts of their collection. 18th century oriental wallpaper had been installed by

the previous owner on the walls of plaintiffs' Palm Beach residence which had been acquired as a completely furnished home. 18th century French parquet flooring has been installed by plaintiffs in their Palm Beach home, and in their New York apartment. Plaintiffs' paintings are never stored but, instead, a limited number are hung on the walls of their Palm Beach home, with most of them on the walls of their New York apartment. Mr. Wrightsman's bedroom in their apartment is furnished with 18th century French furniture and fixtures, and his bedroom in their Palm Beach home contains a French commode. Mrs. Wrightsman's bedroom in their apartment is furnished completely with Louis XV matching furniture and fixtures. Plaintiffs' apartment also has other rooms which contain other works of art from their collection in the form of matching furniture and furnishings.

In sum, what we wish to make clear from the foregoing is that we recognize as established *an* investment purpose for plaintiffs' collection. To be sure, many of the above-detailed facts and circumstances are entirely consistent with investment intent. On balance, however, the evidence does not establish investment as *the* most prominent purpose for plaintiffs' acquiring and holding works of art. The complete record *does* establish, to the contrary, personal pleasure or satisfaction as plaintiffs' primary purpose.

Plaintiffs place much reliance upon *George F. Tyler, supra,* wherein a loss sustained on the sale of part of a stamp collection was held deductible under section 23 of the 1939 Internal Revenue Code as having been incurred in a transaction entered into for profit. The precise factual issue before the court was whether the stamp collection was held primarily for profit or primarily as a hobby. In finding the former purpose to be primary, the Tax Court emphasized that the taxpayer from the outset undertook stamp collecting as an investment; that he consummated all purchases through a professional philatelist,

who stressed the investment feature of stamps; that he purchased stamps only upon the philatelist's recommendation; that he exhibited scant interest in or knowledge of stamps; and that he participated little in those activities generally associated with stamp hobbyists. Thus it was found that although the collection and possession of stamps afforded the taxpayer some pleasure, such activities were undertaken primarily for profit.

The great disparity in facts and circumstances between *Tyler* and the instant case compels the conclusion, we think, that the *Tyler* decision in no sense advances plaintiffs' current cause. The actual importance of the *Tyler* case, for our purposes, lies in the standard there applied:

> \* \* \* The difficulty, then reduces itself to the task of ascertaining whether petitioner has sustained his burden of proving that the desire to make a financial profit was the most important motive which led him to acquire the components of his collections. [6 TCM at 280]

The Tax Court determined, in the factual context of the *Tyler* case, that the taxpayer *had* sustained his burden of proof. We hold, in the factual context of the case before us, that the instant plaintiffs *have not.*

Also easily distinguished from the case at hand are Juliet P. Hamilton, *supra,* and R. Foster Reynolds, *supra,* to which we are referred by defendant. The *Hamilton* case involved the denial of a deduction for a loss sustained on the sale of a single painting which the taxpayer had acquired by specific bequest from her deceased father. Prior to its sale, the painting had been kept by the taxpayer in her home, except that, on several occasions, without profit to the taxpayer, the painting was placed on exhibition for inspection by art students and lovers of art. While in the taxpayer's home, the painting was sometimes made available, by special arrangement, for free inspection, 25 B.T.A. at 1317–1318. The *Reynolds* case, on the other

hand, involved the allowance of a deduction for a loss sustained on the sale of certain jewelry which the taxpayer had acquired by inheritance from his deceased aunt. The jewelry, which was sold for the taxpayer by Cartier, Inc., of New York had been kept in a safe deposit box and at no time had been used by the taxpayer or any member of his family. 4 TCM at 838. We have no quarrel with the rule or reason of the *Hamilton* and *Reynolds* cases. We feel constrained to point out, however, that the rather conspicuous absence of any investment-type activity in the former or personal use in the latter serves to emphasize the appreciably more complex nature of the present controversy.

While the cases cited by the parties afford only minimal guidance for the resolution of the issue in suit, they do affirm as proper the analysis undertaken herein. That is to say, where the issue in question turns upon a taxpayer's state of mind, courts can best treat with such an issue through traditional principles of inference-drawing from an objective view of surrounding facts and circumstances, necessarily on a case-by-case basis. This, despite defendant's urging that "the issue [must] not be left to a miscellaneous assortment of factors for varying judgment in each case." Clearly, we think, by the nature of the issue it must.

█ In accordance with such principles, and for the reasons detailed above, we hold that plaintiffs have failed to sustain their burden of proving the primacy of their investment purpose. Plaintiffs are, therefore, not entitled to recover in this action, and their petition is dismissed.[6]

COLLINS, Judge (dissenting):

I cannot agree with the court's conclusion in this case, and reluctantly I must dissent. At the outset, it should be stated that I regard this as a very difficult and a very close case. Very simply stated, my disagreement with the majority is that I feel that plaintiffs have sustained their burden of proof in showing that they acquired and held works of art *primarily* for investment rather than for personal enjoyment.

The majority have cited a number of facts and circumstances which they claim support their position that plaintiffs were engaged in the collection of art primarily for personal pleasure. As I view these same facts and circumstances, they could just as easily support a position favoring investment intent. Consequently, I feel that the factors relied upon by the court could be applied with equal weight to either side. If these facts were the only points to consider, I would have to agree with the majority since I would conclude that this would not be sufficient to satisfy plaintiffs' burden of proof.

However, there are a few other factors mentioned by the court which point directly to an investment intent. These include plaintiffs' desire to find an investment which would act as a hedge against inflation, plaintiffs' meticulous bookkeeping system, and the fact that they spent so little time at their homes where the large majority of their works of art were kept. (They spend 30 days a year in their New York apartment where 77.8 percent of their art objects are located.) These factors are the ones which, to me, tip the scales in favor of an investment intent.

I am further influenced by the fact that Commissioner Hogenson, who conducted the trial and heard the testimony of all the witnesses, found that plaintiffs had met their burden of proof and were engaged in the collection of art *primarily* for investment purposes. I feel that, in a case which is as close and as difficult as this one, some weight

---

6. At the time of oral argument on April 8, 1970, defendant made and filed a motion to reopen the record for the purpose of introducing additional evidence. Plaintiffs have timely filed a response in opposition to defendant's motion. Upon due consideration by the court, defendant's motion is denied. Judge Davis would grant the motion.

should definitely be attached to this advantage of the commissioner to observe demeanor and judge credibility.

I conclude, therefore, that the weight of the evidence presented is in favor of showing that plaintiffs were engaged in the collection and maintenance of art objects *primarily* for investment reasons rather than for their own personal pleasure and enjoyment. I would adopt the commissioner's findings of fact (which has been substantially done by the court) and his recommended opinion.[1]

---

[1]. I would not adopt that portion of Commissioner Hogenson's recommended opinion allowing only two-thirds of the expenses relating to items actually used by plaintiffs. I feel that the percentage should be higher (possibly 80 to 85 percent).