# Margit Sigray Bessenyey, Petitioner, v. Commissioner of Internal Revenue, Respondent

Docket No. 3774–62.   Filed December 17, 1965.

*Saul Duff Kronovet*, for the petitioner.
*Lee A. Kamp* and *Arnold Y. Kapiloff*, for the respondent.

OPINION

RAUM, *Judge:* 1. *Horse Expenses.*—During the years in issue, 1955–59, petitioner conducted a horse-breeding operation, using two farms for that purpose, one in Montana and one in Maryland, and continues to do so at the present time. She has sustained substantial losses annually from the operation throughout the entire period. But the mere maintenance of a horse-breeding establishment is not sufficient to assure the deductibility of such losses. Under any of the possibly pertinent provisions of the 1954 Code,[1] it is necessary that the operation be conducted for the purpose of making a profit. That purpose may in fact exist even in the face of a history of losses unaccompanied

[1] SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *
SEC. 165. LOSSES.

(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\*    \*    \*    \*    \*    \*    \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *
SEC. 212. EXPENSES FOR PRODUCTION OF INCOME.

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—

(1) for the production or collection of income;

(2) for the management, conservation, or maintenance of property held for the production of income; * * *

by any gains whatever, but the deductibility of those losses must depend upon the taxpayer's proven intention that he sought to realize a profit. *Lamont v. Commissioner*, 339 F. 2d 377 (C.A. 2); *Henry P. White*, 23 T.C. 90, affirmed 227 F. 2d 779 (C.A. 6), certiorari denied 351 U.S. 939; *Doggett v. Burnett*, 65 F. 2d 191, 194 (C.A.D.C.). Nor is it crucial that the expectation of profit be a reasonable one. It is enough that the taxpayer has a bona fide expectation of realizing a profit irrespective of the reasonableness of his expectation; but a record of continued losses over a series of years or the unlikelihood of achieving a profitable operation may be an important factor bearing on the taxpayer's true intention. Cf. *Morton v. Commissioner*, 174 F. 2d 302, 304 (C.A. 2). On the other hand, the presence of losses in the formative years of a business, particularly one involving the breeding of horses, is not inconsistent with an intention to achieve a later profitable level of operation, bearing in mind, however, that the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years.

The intention of the taxpayer is a question of fact to be determined upon the record in each case. *Morton v. Commissioner*, *supra* at 303. The cases in this field turn upon their own facts and no useful purpose would be served by reviewing the conclusions reached in other cases based upon the records made therein. Moreover, it has not been feasible to set forth in our findings all of the extensive evidence in this case, but we are convinced after a careful review of the entire record that petitioner did not conduct her horse-breeding activities in the years before us with the intention of making a profit therefrom.

Although petitioner's horse enterprise has some of the trappings of a business, we think that she did not in fact have a bona fide intention to conduct her activities for a profit. She is a person of considerable wealth, an experienced horsewoman who obviously has a love for horses, particularly Hungarian Half-Breds, which she had raised on her father's estate in Hungary for many years prior to 1946. The U.S. Army had brought a comparatively small number (37) of Hungarian horses to this country after World War II, which it had obtained as spoils of war and which it subsequently (in 1948) undertook to sell. This breed of horses appears to have been hardly known in the United States, and petitioner felt a concern for the "fate" of these horses. Through an agent, she purchased nine brood mares at the Army sale in 1948 at $150 each, but it was not until 6 years later that she began to breed them, using but one stallion for that purpose and subsequently his descendants. She was then plainly interested in continuing the bloodlines of this breed of horses.

Petitioner does not appear to have been concerned with any of the alleged business aspects of the operation. Her testimony was characterized from time to time by ignorance of names, dates, and figures and she showed no apparent interest in them. Indeed, we gained the impression from observation of her during her testimony that figures and financial matters even bored her. We think that she gave little or no thought to whether her horse enterprise would ever be profitable, or whether the large losses that were being sustained annually would ever be recouped. Of course, we may well assume that she would have been pleased to make a profit, but, as we view this record, giving such weight to the testimony as its credibility warrants, petitioner was not engaging in an enterprise for profit. Her rewards consisted of personal satisfaction in the activity. To be sure, enjoyment of one's work is not inconsistent with a profit motive, but we cannot conscientiously find such motive in this case.

Petitioner's operation is to be sharply contrasted with that of Mrs. Judith Gyurky, another Hungarian emigree, who, however, appears to have no outside resources. With a herd of comparable size and having been engaged in the activity in this country for a comparable period,[2] Mrs. Gyurky has been incurring expenses of some $7,000 or $8,000 a year and has made a profit. She is in the serious business of making a living, while petitioner, although devoting her energies and long periods of time to the enterprise, has been conducting her horse operation at two farms about 2,000 miles apart, incurring far greater total average expenses, and sustaining large net losses. This is the sort of thing that can be done by a person of means unconcerned with making a profit currently or even ultimately, to say nothing of recouping heavy losses sustained over a substantial period of years. We take a dim view of counsel's suggestion that petitioner's expenses will stabilize at a much lower level in future years, nor do we think that petitioner in fact expects to achieve any such marked decrease in expenses or that receipts from the enterprise will exceed the expenses, or that petitioner genuinely expects such receipts to exceed her expenses.

We must decide this case upon our evaluation of the evidence before us, and we cannot find that this petitioner was in the horse-breeding business with a bona fide intention of making a profit. To the contrary, it is our conclusion that she was engaged in these activities because of her love of horses, her interest in the Hungarian Half-Breds, and her desire to establish and perpetuate them as a recognized breed of horses in the United States. Losses thus sustained are not deductible.

---

[2] Although Mrs. Gyurky bred her horses for 1 or 2 years beginning in 1949, she apparently ceased her breeding operation for some 7 years and recommenced it about 1956.

2. *Alien Property Expenses.*—In 1959, the U.S. Office of Alien Property released to petitioner the following items which it had previously seized:

Cash bequest of $25,000 together with $7,875 interest,
    less $2,362.50 income taxes paid_____ $30, 512. 50
Residuary legacy_____ 20, 027. 39
                                                        _____
    Total_____ 50, 539. 89

In connection with these two items, the Office of Alien Property at the same time charged petitioner fees or commissions, referred to as "administrative expenses," in the amount of $6,575 and $4,005.48, respectively. Also, petitioner paid fees in the amount of $2,085.61 in 1959 for legal services in obtaining the release of the foregoing bequest and legacy. She claims deductions for these legal fees and administrative expenses under section 212 of the 1954 Code, which provides:

In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year—
    (1) for the production or collection of income;
    (2) for the management, conservation, or maintenance of property held for the production of income; * * *

The record is skimpy in respect of the two items here in issue, but doing the best we can with the materials before us we have concluded that the expenses allocable to the residuary bequest are not deductible but that the remaining expenses allocable to the cash bequest and interest are deductible.

(a) *Residuary Legacy.*—This item, in the amount of $20,027.39, cannot qualify under either paragraph (1) or (2) of section 212. It is certainly not an item of income so as to bring paragraph (1) into play, nor is there any convincing evidence in the record establishing that it was "property held for the production of income" under paragraph (2). The burden of proof was upon the petitioner, and it has not been carried as to this item.

(b) *Cash Bequest.*—The evidence discloses that this bequest, in the amount of $25,000, together with accumulated interest in the amount of $7,875, came into the hands of the Office of Alien Property on August 26, 1947. Thus, the record indicates that in some undisclosed manner this item was being held for the production of income, and although we would have preferred more solid evidence in this regard, we are reasonably satisfied that this bequest falls within paragraph (2) of section 212 as property held "for the production of income"; the accompanying interest by its very nature falls within paragraph (1). However, this alone is not sufficient to render section 212 applicable to this item as a whole; for, if the so-called expenses are in reality capital outlays, they would not qualify as "ordinary and necessary

expenses" under section 212, and would be added to the basis of the property involved or treated as a charge against the cash received for such property. *Spangler* v. *Commissioner*, 323 F. 2d 913 (C.A. 9).

The cases dealing with the question whether legal expenses incurred in obtaining the return of property seized by the Alien Property Custodian are to be regarded as capital costs and therefore not deductible as "expenses" (see O.D. 1048, 5 C.B. 127; A.R.R. 2318, II–1 C.B. 82) have reached results that are often difficult to reconcile with one another. For example, compare *Spangler* v. *Commissioner*, *supra*, with *Ruoff* v. *Commissioner*, 277 F. 22d 222 (C.A. 3), reversing 30 T.C. 204. However, we need not enter that thicket, for the $25,000 bequest in the present case, unlike *Spangler* and *Ruoff*, involves cash alone. It does not involve property having a basis to which the expenses in issue could be added, nor is this a case where "the cash was in lieu of the property, the property had a basis,[19] and a taxable conversion occurred," with the result that the expenses might be a charge against the cash in computing gain or loss in respect of the property. *Spangler* v. *Commissioner*, *supra* at 920. This case involves only cash, the situation dealt with in footnote 19 in the *Spangler* case as follows:

It is argued with force in 12 Tax L. Rev. 241 (1956–1957) and held in California & Hawaiian Sugar Ref. Corp. v. United States, 311 F. 2d 235 (Ct. Cl. 1962), that disbursements are not to be capitalized when the underlying transaction is such that the disbursements cannot be added to a basis and thus receive consideration in determining tax.

Where, as in the present case, petitioner recovered cash and the amount so received was not in lieu of other property, the expenses incurred cannot be considered as part of the cost of any other assets. Such expenses must be allowed as a deduction from income under section 212 or their tax benefit will be lost to petitioner, a result that is not required either by statute or ruling. Cf. *Petschek* v. *United States*, 335 F. 2d 734, 737 (C.A. 2). We hold that the expenses allocable to the $25,000 cash bequest and accompanying interest are deductible.

*Decision will be entered under Rule 50.*