**Samuel E. and Frances G. EASTMAN**

v.

**The UNITED STATES.**

No. 528–78.

United States Court of Claims.

Oct. 22, 1980.

---

14. *Werner v. United States*, Ct.Cl., 590 F.2d 344 (1978), *cert. denied*, 441 U.S. 963, 99 S.Ct. 2410, 60 L.Ed.2d 1068 (1979).

Michael H. McConihe, Washington, D.C., attorney of record, for plaintiff.

Betty N. Ferber, Washington, D.C., with whom was Asst. Atty. Gen., M. Carr Ferguson, Washington, D.C., for defendant; Theodore D. Peyser and Robert S. Watkins, Washington, D.C., of counsel.

Before FRIEDMAN, Chief Judge, and KASHIWA and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed August 14, 1980, moving that the court adopt the recommended decision of Trial Judge Roald A. Hogenson, filed July 10, 1980, pursuant to Rule 134(h), since plaintiffs have filed no notice of intention to except or exceptions thereto and the time for so filing pursuant to the Rules of the court has expired. Upon consideration thereof, without oral argument, since the court agrees with the trial judge's recommended decision, as hereinafter set forth,* it hereby grants defendant's motion and affirms and adopts the recommended decision as the basis for its judgment in this case. Therefore it is concluded that plaintiffs are not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

HOGENSON, *Trial Judge:* This is an action to recover federal income tax and assessed interest paid for the calendar years 1972, 1973 and 1974, in the aggregate

---

* Although the court adopted the trial judge's separate findings of fact, which are set forth in his report, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

amount of $10,868.37. The suit arises out of disallowance by the Commissioner of Internal Revenue (Commissioner) of certain deductions plaintiffs took of expenses incident to the operation of a horse–training, showing and breeding enterprise under section 162 of the Internal Revenue Code of 1954 (the Code). For the reasons appearing below, it is determined that taxpayers' horse–related operations constituted an "activity· * * * not engaged in for profit" within the meaning of section 183(a) of the Code, that disallowance of the deductions was proper, and that plaintiffs are not entitled to recover.

Plaintiffs are husband and wife residing in Washington, D.C. Plaintiff Samuel E. Eastman was graduated from Princeton University in 1947 and Harvard Law School in 1949. He taught business law and business economics from 1950 through 1955 at the Harvard Business School and has since engaged in a number of independent business enterprises. During the period in issue he worked for the United States Department of Transportation as Director of the Office of Policy Review.

Plaintiff Frances G. Eastman was employed part time as an administrative assistant for the Asia Foundation during the taxable years in issue. Plaintiffs' total gross income during 1972, 1973 and 1974 was $40,158, $41,854, and $40,694, respectively.

Plaintiffs have three daughters, Melissa Sue Eastman, born in 1953, Megan Sarah Eastman, born in 1955, and Amanda Ford Eastman, born in 1959. Plaintiffs' daughters Melissa and Megan are accomplished horsewomen. Their interest in horses began when they were in grade school and started taking lessons in riding, horsemanship and horse care in a school–sponsored program at Camp Furman in Potomac, Maryland. About the time they entered high school, their equestrian activities shifted to Rock Creek Stables in Washington, D.C., where they taught other students, exercised and trained horses, and began showing horses owned by Rock Creek Stables. The owner of the stables described Melissa

and Megan as "superior" riders, approaching Olympic material.

Plaintiffs' daughters asked their parents to purchase horses with which they had worked at the stables from time to time. When Melissa was 16 and had achieved a 3.5 grade point average, she and her parents began seriously looking for a horse to purchase. Plaintiff Samuel Eastman made a conscious effort to choose a quality, registered horse, reasoning that because of the high cost of boarding and maintaining a horse, he would protect his investment only if he purchased an unschooled, purebred horse whose value would increase substantially as it was trained.

In April 1969 when Melissa was 16 years of age, plaintiffs purchased for her an untrained, purebred, thoroughbred mare named Glister, born May 18, 1966. In July 1970, when Megan was about 14 years of age, plaintiffs likewise purchased for her an untrained, purebred, quarter horse mare named Bashful Ginger, born March 22, 1968. The certificates of registration for Glister and Bashful Ginger were issued in the names of Melissa and Megan, respectively, in order to indicate to plaintiffs' daughters that they were to be responsible for the care of their horses.

Plaintiffs purchased the horses for use by their daughters as pleasure horses. Melissa and Megan intended to train the horses and to show them in horse shows and competitions. Melissa and Megan continued to spend substantially all of their free time working with their horses at Rock Creek Stables, where the horses were boarded.

Although neither plaintiff enjoys riding or showing horses, the Eastmans encouraged the interest of their daughters in horses, believing that riding, caring for, training, and showing horses was a wholesome, health activity for young women.

In 1970 plaintiff Samuel Eastman became a member of the Board of Directors of Rock Creek Stables, where he was called upon to advise the owner on administrative and financial matters. Through acting in this capacity and by talking with various instructors and horse owners at the stables

and at horse shows in which his daughters competed, Mr. Eastman became knowledgeable about the practical and economic aspects of the horse–renting and riding instruction business.

During the summer of 1970, taxpayers and their daughters took advantage of an opportunity to spend a month in Garrett County, Maryland, at the home of friends who also owned a barn and a show ring which could be used to accommodate the horses. Melissa entered Glister in a total of seven horse shows in Garrett County and in and around the Washington, D.C., area during the summer of 1970; Megan entered Bashful Ginger in one show in Gaithersburg, Maryland.

In the fall of 1970, plaintiffs confronted a changed set of economic circumstances. They had placed Megan and Amanda in private schools and anticipated that Melissa would be attending college the following year. Plaintiff Samuel Eastman had accepted a job with the Department of Transportation, the salary ceiling for which had been set by an Act of Congress. The cost of maintaining the horses had also proved to be greater than plaintiffs had expected.

In December of 1970, plaintiffs had a family meeting to discuss ways of dealing with their financial situation. Among the alternatives discussed was selling the horses. Both Melissa and Megan objected to selling their horses. They cared for their horses, and Melissa felt that Glister, at age 5, was just beginning her years of peak performance as a show horse. The family next considered leasing the horses out for riding in return for partial board payment. The girls objected to this course of action because allowing the horses to be ridden by others could confuse the horses and make them less responsive to training by their owners. Furthermore, leasing the horses would not be profitable enough to cover boarding costs. Because the horses were very spirited and could not be handled by the average patron of Rock Creek Stables, there would not be a great demand for them as lease horses.

Finally, the family considered breeding the horses and training and selling the foals. After deciding on this course of action, plaintiffs and their daughters determined that before breeding Glister and Bashful Ginger, in order to create a market for and enhance the value of the foals, Melissa and Megan would first train the mares extensively and show them at horse shows and fairs frequently, winning prizes and ribbons, and thereby establishing the reputations of Glister and Bashful Ginger as quality show horses. They did not intend to breed the horses until they had reached age 4. Plaintiffs christened the horse–breeding enterprise, "Sam and Sue Eastman et Filles."

After December 1970 there was no significant change in the manner in which the horses were treated. Glister and Bashful Ginger continued to be boarded at Rock Creek Stables because these stables were convenient to the Eastman residence, even though the stables had no facilities for breeding and would not permit horses to deliver foals there. Plaintiffs' daughters continued to train the horses on an average of approximately 2 hours per day while school was in session and 4 hours per day during vacations. Following the family's decision to embark upon a horse–breeding activity, Megan and Melissa continued to show their horses, albeit less frequently than before, during the tax years in question.

Glister was shown seven times in 1971, twice in 1972, but not at all in 1973 and 1974. Glister was first bred in 1973, but she did not "take." She was not bred at all in 1974. Bashful Ginger was shown twice in 1971, once in 1972, not at all in 1973, and once in 1974. No intentional effort was made to breed Bashful Ginger in 1971, 1972 or 1973; she was, however, accidentally impregnated by a part–saddlebred horse in 1973 and gave birth to a filby named Ginger Snap in 1974. Bashful Ginger was intentionally bred in 1974, but before it could be determined whether she had "settled," or conceived, both Bashful Ginger and Ginger Snap were destroyed by fire.

Plaintiffs abandoned their horse–breeding enterprise in December of 1974.

On their tax returns for the taxable years 1972, 1973 and 1974, plaintiffs deducted all costs incident to the maintenance, training, showing, and breeding of Glister and Bashful Ginger. They deducted the costs incurred in transporting Melissa and Megan to the stables where their horses were boarded. They fully depreciated the cars used for transportation. They purchased a house trailer in Garrett County and took full depreciation on the house trailer, its furnishings and certain improvements, and they deducted the cost of living in the trailer during the summer. Megan enrolled in a course in horse mastership in England in the fall of 1973, and plaintiffs deducted the cost of transportation, instruction and accommodation for the 5–month course. Finally, plaintiffs depreciated the horses and the tack.

The Internal Revenue Service commenced its audit of plaintiffs returns in 1975, after plaintiffs had abandoned their horse–breeding operation. Deficiencies were assessed for 1972, 1973 and 1974, on the ground that the horse–related venture was an "activity * * * not engaged in for profit" within the meaning of section 183(a) of the Code.

Plaintiffs had also claimed a medical expense deduction in 1974 of $358. After making certain adjustments to the figures reflecting plaintiffs' adjusted gross income for 1974, the Commissioner allowed a medical deduction for only $171.

On April 6, 1978, plaintiffs paid the deficiencies, together with assessed interest, as follows:

| Year | Tax | Interest | Total Refund Claimed |
|------|-----|----------|----------------------|
| 1972 | $2,776.23 | $ 927.69 | $ 3,703.92 |
| 1973 | 3,567.47 | 978.05 | 4,545.52 |
| 1974 | 2,157.00 | 461.93 | 2,618.93 |
| Total | $8,500.70 | $2,367.67 | $10,868.37 |

Simultaneously therewith plaintiffs filed claims for refunds of the amounts paid, asserting that the losses incident to the horse–breeding operation were losses incurred in a trade or business within the meaning of section 162.

The Commissioner took no action on plaintiffs' claims within 6 months after the date of filing, and plaintiffs filed their petition herein on December 12, 1978.

Section 162 of the Code allows a deduction for the ordinary and necessary expenses a taxpayer pays or incurs during the taxable year in carrying on activities which constitute a trade or business. Section 183(a) provides that if such activity is not engaged in for profit, however, no deduction will be allowed for expenses attributable to the activity, except as provided in section 183.[1] Section 183(c) defines an "activity * * * not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 * * *."

■ The test for determining whether an activity is engaged in for profit is whether the individual engaged in the activity with the primary purpose of making a profit; if the activity is carried on for personal or family recreation and the taxpayer does not show an overriding profit motivation, no deduction will be allowed. *Monfore v. United States*, 214 Ct.Cl. 705, 720–21, 77–2 U.S.T.C. ¶ 9528 at 87,750 (1977); *Patterson v. United States*, 198 Ct.Cl. 543, 552, 459 F.2d 487, 493 (1972); Treas.Reg. § 1.183–2(a). The taxpayer must have a *bona fide* expectation of realizing a profit, *Monfore, supra*, at 721, 77–2 U.S.T.C. ¶ 9528 at 87,751, although such expectation need not be reasonable. *Golanty v. Commissioner*, 72 T.C. 411, 425–26 (1979), *appeal filed*, 9th Cir. Aug. 31, 1979. Whether plaintiffs had the requisite intention is a question of fact to be determined on the basis of all the facts and circumstances, and

---

1. Section 183(b)(1) allows those deductions which would be allowable without regard to whether or not such activity is engaged in for profit; section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed, "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)."

the burden of proof is on the petitioner. *Monfore, supra,* at 721, 77–2 U.S.T.C. ¶ 9528 at 87,751; *Patterson, supra,* 198 Ct.Cl. at 553, 459 F.2d at 493; *Dunn v. Commissioner,* 70 T.C. 715, 720 (1978), *aff'd without opinion,* 607 F.2d 995 (2d Cir. 1979).

The regulations set forth some of the relevant factors, derived from prior case law, which are to be considered in determining the applicability of section 183: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; (9) elements of personal pleasure or recreation. Treas.Reg. § 1.183(2)(b)(1)–(9). No one factor is conclusive; a decision is not reached merely by counting the factors enumerated in the regulations. *Dunn, supra,* at 720; *Fisher v. Commissioner,* No. 10273–78 [80,183] (T.C.M. May 21, 1980), slip op. at 10–11. The testimony of the taxpayer as to his subjective intent to make a profit is given less weight, however, than objective facts on the record. *Monfore, supra,* at 723, 77–2 U.S.T.C. ¶ 9528 at 87,751; Treas.Reg. § 1.183–2(a).

In applying the law to the facts of the instant case it becomes clear that plaintiffs, horse–breeding and showing activity was an "activity * * * not engaged in for profit" within the meaning of section 183(a) of the Code.

Prior to December 1970 plaintiffs had no knowledge of or expertise in breeding horses or conducting a horse–breeding business. They made no attempt to ascertain whether it was possible to conduct a breeding enterprise with only two horses so that it could make a profit. *Compare Deerman v. Commissioner,* 43 T.C.M. (P–H) ¶ 74,084 at 411–12 (1974); *Pennington v. Commissioner,* 36 T.C.M. (P–H) ¶ 67,111 at 567 (1967). They did not have an experienced breeder examine Glister and Bashful Ginger to ascertain whether they would be suitable for use as brood mares, nor did they seek expert advice as to how to manage a small–scale breeding enterprise for profit. *Compare Deerman, supra,* at 410, 411. Plaintiffs intended to rely on their daughters, who were 17 and 14 years of age at that time, to make all necessary decisions concerning choice of sires, location of boarding facilities at foaling time, training and exhibiting the horses to enhance the reputation of their foals, and training the foals. At the time the Eastman family decided to embark on their horse–related activities, Melissa and Megan had had only limited exposure to horse breeding; their knowledge was acquired generally from reading books and from instructions they received while attending Camp Furman in grammar school. Melissa had observed the birth process on film.

Following their decision to enter the horse–breeding business, there was no significant change in the way the horses were treated. Plaintiffs did not change their operating methods to improve the prospects of profitability. *See* Treas.Reg. § 1.183–2(b)(1); *compare Dunn, supra,* at 721. For example, Melissa and Megan felt that it would be inadvisable to breed the horses before they reached age 4. Although Bashful Ginger was not even 3 years of age at the time, plaintiffs did not consider selling her and replacing her with a horse which could be used to produce foals sooner. Although Bashful Ginger was old enough to be bred in 1972, no efforts were made to breed her in 1972 or during the breeding season of 1973. She was accidentally impregnated only in July of 1973, after the season had ended. Three attempts were made to breed Glister in spring of 1973, but after she failed to "settle" no further attempts were made during the taxable years in question.

The amount of time and effort plaintiffs themselves devoted to the enterprise was limited by the fact that plaintiff Samuel Eastman held a very demanding, "6–day–

a—week" job during the period in question. Although less limited by her part—time job, plaintiff Frances Eastman performed only supportive functions for the venture. She drove her daughters to and from the stables before they were old enough to obtain drivers licenses, made sandwiches for them to take to horse shows, and the like. Plaintiffs' daughters did expend a considerable amount of time and energy training and showing the horses. Their dedication, however, is equally demonstrative of a commitment to the horses themselves and an inclination to work with them as it is of a profit—making intent. *See Golanty, supra,* at 430.

Plaintiffs and their daughters had resolved to create a market for foals produced by Glister and Bashful Ginger by showing the horses extensively, yet the horses were shown *less* frequently during the tax years in question than they had been prior to the creation of Sam and Sue Eastman et Filles. Plaintiffs accounted for this circumstance by noting that Melissa had eloped suddenly in May of 1973 and moved to Arkansas. Glister did not join her there until August, and then in late fall Melissa returned to the Washington, D.C., vicinity, leaving Glister behind for the remainder of the period in issue. During the considerable time that Melissa was separated from Glister, however, plaintiffs did not hire professionals to train or show Glister. *Compare Coe v. Commissioner,* 43 T.C.M. (P–H) ¶ 74,129 at 555–56, 557 (1974); *Farris v. Commissioner,* 41 T.C.M. (P–H) ¶ 72,165 at 862 (1972).

Bashful Ginger was not shown more often in 1972 because Megan felt that Bashful Ginger was still too young and not well enough trained at that time to compete successfully. Megan had owned Bashful Ginger for almost 2 years by that time, but the amount of time she could spend training her horse was limited by the fact that she was a full—time high school student until June of 1973 and was absent for 5 months while attending Crabbett Park Equitation,

Ltd., in England from 1973 to 1974. Plaintiffs did not employ a qualified person to train or show either of the horses when it was inconvenient or impossible for their daughters to carry on these activities. *Compare Deerman, supra,* at 412.

Prior to embarking upon their horse—breeding activity, plaintiffs did not investigate whether there were stallions available which would be appropriate to breed with their mares, or whether the stud fees commanded by such stallions would make it possible to sell the foals at a profit. *Compare id.* at 410. Melissa and Megan subsequently encountered difficulty in finding suitable registered stallions of the proper appearance and disposition with which to breed Glister and Bashful Ginger. In the case of Bashful Ginger, this difficulty was in part due to the fact that she was very unusual in appearance, being of the Western type of quarter horse which stands almost 16 hands in height. In addition, Bashful Ginger was all black except for a white star on her forehead, which coloring is very rare in a quarter horse. Plaintiffs sought to breed her to a black stallion to preserve this coloring and to increase the value of the foal.[2] Although this goal was consistent with a profit—seeking motive, the failure of plaintiffs to investigate the availability of stallions prior to embarking on the horse—breeding activity does not indicate a "businesslike concern for the economics of the * * * venture." *Id.* at 412.

In the case of Glister, plaintiff Samuel Eastman testified that in seeking an appropriate stallion, he was mindful that her sire had generated not insubstantial winnings racing in Argentina, and he sought to breed Glister to a racehorse in hopes of producing a more valuable horse for the track. Melissa Eastman, however, denied any intention to produce a racehorse; in her search for a stallion she focused on a calm disposition and a well—proportioned appearance and intended to raise the foal as a show horse. *Compare Stoltzfus v. Commissioner,* 39

**2.** Because of the accidental impregnation of Bashful Ginger by the part—saddlebred horse named Rocket and the subsequent destruction of both mare and filly by fire, however, plaintiffs were unable to achieve this ambition.

T.C.M. (P–H) ¶ 70,337 at 1767 (1970). These inconsistencies as to the type of horse Sam and Sue Eastman et Filles intended to be producing highlight the fact that plaintiffs had no clear–cut plan of development for their breeding activity beyond the initial phase, which was simply to continue with the training and showing of the horses as before in order to establish their reputations.

Plaintiffs failed to evidence prudent management and a businesslike concern for making a profit in carrying on their horse–breeding activity in several other respects. Although they opened a checking account in November 1972 in the name of Sam and Sue Eastman et Filles, the expenses of the horse–breeding activity were not segregated into that account. Plaintiffs did not keep any formal books or accounts for earnings or expenses but merely retained their check stubs and compiled worksheets once a year when they made up their tax returns. *Compare Pennington, supra*, at 567. They made little or no effort to promote Sam and Sue Eastman et Filles in a businesslike manner consistent with a profit motive. *Compare Stoltzfus, supra*, at 1789. They did not insure the horses. *Compare id.* at 1788. Although they entered the horses in shows to enhance their reputations, they kept no systematic record of the shows to demonstrate the success of the horses to those interested in purchasing the foals. They did not even maintain records of the occasions and circumstances when the horses were bred. *Compare Deerman, supra*, at 412.

Despite a clear element of personal use in connection with the horses, plaintiffs made no attempt to prorate either capital or operating expenses to reflect this element; they simply began deducting all costs connected with this activity in any way as business expenses. *Compare Farris, supra*, at 862.

In order to make a profit at breeding horses, it is necessary to breed them virtually every year, according to John Beachy, a breeder with 20 years of experience. The gestation period is 11 months. Pregnant horses should not be transported or shown, except perhaps at halter. Consequently, it appears that once plaintiffs had actually entered the breeding phase of their contemplated activity, the show careers of Glister and Bashful Ginger would have effectively ended. The delays and the sporadic nature of efforts to breed the mares indicate that the family was neither diligent nor businesslike in their efforts to carry out the actual breeding aspect of the activity. The record also tends to suggest that the primary motivation of plaintiffs in deciding to breed the mares was to continue providing horses on which their daughters could display their equestrian talents; they merely hoped for an opportunity to subsidize the recreational activities of their daughters by selling any foals occasionally produced by Glister and Bashful Ginger to help defray the cost of maintaining pleasure horses. *Compare Stoltzfus, supra*, at 1786. The horses were trained, exhibited and bred for the most part only as it suited the personal inclinations and convenience of plaintiffs' daughters and not pursuant to any strategy or program for developing a profit–making business. *See Golanty, supra*, at 419.

■ An experience of losses for several years in succession at the outset of a horse–breeding activity is not unusual and does not, of itself, indicate that the activity should be treated as a hobby for tax purposes. *See, e. g., Farris, supra*, at 862; *Stoltzfus, supra*, at 1774; Treas.Reg. § 1.183–2(b)(6). The unlikelihood of ever achieving a profitable operation, however, reflects directly on the tax characterization of the endeavor. *See Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), *aff'd*, 379 F.2d 252 (2d Cir.), *cert. denied*, 389 U.S. 931, 88 S.Ct. 293, 19 L.Ed.2d 283 (1967). In the instant case, plaintiffs testified that they were motivated by financial pressures to undertake an activity for profit, yet they allegedly developed a plan that entailed showing the horses for several years in order to develop a reputation, breeding the horses, taking the foals produced 11 months later and raising them until they were old enough to train, training the foals for several years, and only then marketing the

foals to realize the first income from the venture. The actual loss experience of the enterprise, in combination with the considerable anticipated losses due to board and other expenses under the long-range plan as plaintiffs described it, indicate no likelihood that the venture would ever have shown a profit even absent the set-backs plaintiffs actually encountered which caused them to abandon their activity. *See Golanty, supra,* at 427–28.

Taxpayers' decision to initiate a horse-breeding activity arose from their desire to continue what they considered to be a wholesome activity for their daughters while minimizing the costs to themselves. Despite the changed financial situation confronting the Eastman family in December of 1970, plaintiffs' daughters were strongly opposed to selling their horses, and plaintiffs themselves were reluctant to sell the horses. Notwithstanding the testimony of taxpayers and their family to the contrary, the objective facts indicate that taxpayers' predominant purpose in undertaking their horse-breeding activity was to minimize the cost of maintaining pleasure horses for their daughters. An attempt to minimize costs does not, however, constitute a profit motive that will transform a hobby into a trade or business. *See Monfore, supra,* at 727, 77–2 U.S.T.C. ¶ 9528 at 87,753.

The single factor which militates most strongly against plaintiffs' case is the unmistakable cast of personal pleasure and satisfaction which plaintiffs' daughters derived from owning, caring for, training, and showing their horses. It was apparent from the testimony and demeanor of Melissa and Megan at trial that they would have continued to engage in their horse-related activities as a matter of personal preference whether or not it was possible to derive a profit therefrom, and both girls did continue after the "business" was abandoned in December 1974. For example, Megan returned to England in 1975 to complete the course and examination in horse mastership which she began in 1973, for which Sam and Sue Eastman et Filles had taken a deduction. Melissa acquired two geldings during the period she was separated from Glister, so that she was never without a horse to ride and show. Even though plaintiffs themselves did not use the horses for pleasure it is clear that their predominant motive in maintaining the horses was for family recreation. In such a case no deduction for depreciation and expenses is allowable. *Monfore, supra,* at 721, 77–2 U.S.T.C. ¶ 9528 at 87,750.

The earnings of Samuel and Frances Eastman enabled the family to maintain a comfortable standard of living despite the losses generated by their horse-breeding activity. *See Golanty, supra,* at 428–29; Treas.Reg. § 1.183–2(b)(8). The Eastmans fall within that class of taxpayers to which Congress intended section 183 of the Code to apply–those who are not carrying on a business to realize a profit, but rather are merely attempting to utilize the losses from the operation to offset their other income. *See* S.Rep.No. 91–552, 91st Cong., 1st Sess. 103, *reprinted in* 1969–3 C.B. 489.

### CONCLUSION OF LAW

Upon the foregoing opinion and findings of fact which are adopted by the court, the court concludes as a matter of law that plaintiffs are not entitled to recover, and the petition is dismissed.