JAMES R. STEELE and ELIZABETH A. STEELE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Steele v. Commissioner
Docket No. 22637-80.
United States Tax Court
T.C. Memo 1983-63; 1983 Tax Ct. Memo LEXIS 712; 45 T.C.M. (CCH) 640; T.C.M. (RIA) 83063; February 2, 1983. *712 Held, petitioners' dog breeding and showing activities were activities "not engaged in for profit" as defined by sec. 183, I.R.C. 1954. Consequently, their losses from such activities are not deductible. James R. Steele, pro se. Robert J. Burbank, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated September 19, 1980 respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Addition to tax under
Year
Deficiency
sec. 6651(a)
1976
$2,581
$494
1977
2,203
298
1978
2,416
The issues for decision are: (1) whether petitioners' *714 dog breeding and showing activities were activities "not engaged in for profit" as defined by section 183, I.R.C. 1954; (2) if such activities were engaged in for profit, whether petitioners are entitled to deductions greater in amount than those allowed by respondent; (3) whether petitioners are entitled to a sales tax deduction in 1976 greater in amount than that allowed by respondent; and (4) whether petitioners are liable for the addition to tax under section 6651(a) for delinquently filing their Federal income tax returns for the taxable years 1976 and 1977. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, James R. Steele and Elizabeth A. Steele, were residents of Baton Rouge, Louisiana at the time of filing their petition in this case. They filed joint Federal income tax returns for the years 1976, 1977 and 1978 with the Internal Revenue Service Center, Austin, Texas.
Petitioner James R. Steele graduated from Louisiana State University in 1967 with a masters degree in Dairy Science.His major field of study was *715 animal breeding. In June of 1969, he began employment with Gulf South Research Institute as a research analyst and was so employed during the tax years in question. While employed by Gulf South Research Institute, James Steele normally worked a standard 40-hour, 5-day week. During the years in question, he also was employed occasionally as an actor by various film companies. Petitioner Elizabeth A. Steele was employed by South Central Bell Telephone Co. during the years 1976 through 1978. She generally worked 40 hours a week on a rotating shift during this period. Petitioners began their dog breeding activities in May of 1971. Prior to that time, James R. Steele conducted a limited feasibility study from which he determined that he could make a profit through collecting stud fees and raising and selling puppies. The study consisted mostly of talking to several dog breeders personally. James R. Steele devised estimates on the number of dogs petitioners needed, the number of puppies they could expect, the prices for which they could sell the puppies, the stud fees they would collect, and the expenses they would incur in operating the business. In preparing to commence their *716 dog breeding activities, petitioners established a bank account under the name of Lizan Kennels. Cancelled checks from that account served as petitioners' primary records. Petitioners have confined their dog breeding activities to two breeds: boxers and Afghans.During the years in question, a "pet quality" boxer puppy had a market value of $150 to $300 and a "championship quality" boxer puppy had a market value of approximately $350. Afghans were somewhat more valuable. A "pet quality" Afghan puppy had a market value of $300 to $400, while a "championship quality" Afghan puppy had a market value of $400 to $800. Male champions of either breed generally received higher stud fees than nonchampion dogs of the same breed. Petitioners were acutely aware of the fact that championship quality dogs were more valuable than other dogs since they could demand more for stud fees and their puppies brought higher prices. Consequently, they were very interested in owning dogs that obtained championship status. During 1976 through 1978, a dog needed 15 championship points and two "major" show wins to obtain certification as a champion from the American Kennel Club (hereinafter AKC). Championship *717 points are acquired when a dog wins first place in its class at an AKC-licensed show. The number of points earned by the winning dog is based on the total number of dogs entered in that class in that particular show. As the number of dogs entered into a show increases, the number of points (one to five) awarded to the winner also increases. A "major" win is a win in which three or more points are received by the winning dogs in each class. During the years in question, petitioners usually owned approximately seven to ten dogs. Of these dogs, petitioners generally tried to have two to four dogs that they were showing in hope of qualifying them as champions. In this regard, petitioners occasionally employed a professional dog handler to handle their dogs at various shows. Petitioners did not keep individual records of each dog's expenses, but they did keep individual records of each dog's show winnings and medical history. In 1976 petitioners apparently owned three Afghans--two males and one female. [1] The female, Dic-Mar's Pearl of Lizan (Princess), was purchased on May 24, 1971 for $750. Princess was shown in various dog shows and acquired two AKC points. *718 The first male, Dic-Mar's Master Blue of Lizan (Master Blue), was purchased at the same time as Princess for $625. Master Blue was shown during 1974 and 1975 receiving six championship points and 17 ribbons; however, he developed a limp in 1974 which eventually ended his show career. Thereafter, Master Blue was used as a stud for Princess and another Afghan, Dic-Mar's Lady in Blue of Lizan (Lady), who petitioners owned until 1974. In 1974, Lady had five puppies by Master Blue but, unfortunately, four of the puppies died because Lady had "bad milk." The second male, Lizan Silver Cloud (Cloud) was born during December 1972 from Princess after she was bred with an outside stud, Dic-Mar's Candlelight. According to the agreement which was executed when Princess was purchased, petitioners received three puppies from Princess's litter.Petitioners sold two of these puppies and kept Cloud. Cloud was shown in various dog shows but did not receive any AKC points. Petitioners also owned three boxers during 1976--two females and one male. Petitioners already owned the first female, Miss Ritz, prior to becoming interested in dog breeding in 1971. Petitioners were given Miss Ritz in *719 1969.She was not shown and acquired no AKC points. Miss Ritz was bred in 1971 and gave birth to six puppies. However, because Miss Ritz had "bad milk" none of these puppies lived.She was bred again in 1973 or 1974 but only one puppy, a female boxer named Bit, lived. Bit was not campaigned and it is unclear what happened to her. Petitioners bought the second female, Hy-Court's Whispering Wind (Sissy), in 1972. Sissy was shown at various dog shows and collected two AKC points. Sissy had an infected uterus and required chemical hormones to conceive. One successful breeding produced three puppies; however, two of these puppies died because Sissy's milk was defective and the third was put to sleep because of defective coloration. Sissy subsequently developed a hip paralysis and was put to sleep. [2]
Petitioners purchased their male boxer, By-Crest Bad News of Lizan (Bad), in September of 1972. Bad was campaigned successfully in Canada during 1975 and became a Canadian champion. Bad *720 was also campaigned in the United States and, through 1975, obtained 16 AKC points with one major win. Petitioners apparently owned the same dogs during 1977 with the exception of Sissy, who had already been put to sleep. Bad developed cancer during that year and had a tumor removed from his thyroid. He subsequently was put to sleep in either 1977 or 1978. Similarly, Miss Ritz also developed cancer and was put to sleep about that time. In 1978 petitioners acquired an Afghan male, Snow, whose sire was the "leading Afghan male * * * in the country." Snow was shown in various dog shows and lacked one major win from becoming a champion when he was sold in 1973. [3]
Petitioners also owned a puppy in 1978 that they had raised named Silver. Silver developed a dermatological problem which caused loss of hair and it is unclear whether or not petitioners still own him. Between 1971 *721 and 1975, petitioners housed all of their dogs in cages stacked in the living room of their personal residence. However, during 1975, petitioners screened in the back portion of their personal residence. Subsequently, some dogs were still kept in the living room cages while the remainder were relegated to the back portion. Petitioners' dog breeding activities have not proved to be profitable as the following chart illustrates: Income
Deductions
from
related to
Loss on
Other
Year
dogs
dogs
dogs
Wages
income
1971
$195.00
$2,846.62
($2,651.62)
$22,820.95
1972
475.00
4,567.68
( 4,092.68)
25,447.75
1973
525.00
7,518.03
( 6,993.03)
27,447.75
1974
1,040.00
8,394.73
( 7,354.73)
30,786.19
1975
400.00
8,475.57
( 8,075.57)
32,573.91
1976
25.00
7,268.46
( 7,243.46)
35,901.43
15.94 1977
200.00
6,310.00
( 6,110.00)
36,300.00
606.00 1978
416.62
6,714.19
( 6,297.57)
41,881.24
793.76 1979
500.00
2,814.00
( 2,314.00)
46,236.00
(1,402.00)
1980
1,504.14
( 1,504.14)
6,912.57
10,097.09 The income realized by petitioners from their dog breeding activities consisted primarily of proceeds from *722 dog sales and stud fees. The expenses, on the other hand, included amounts for show fees, dog food, veterinary fees and supplies, travel and entertainment at dog shows, stud fees, telephone, photography, casual labor, advertising, stationery, professional fees, AKC fees, and depreciation on dogs and cages. Additionally, petitioners deducted depreciation and utilities on a portion of their home--usually one-fifth--and a travel trailer which was utilized to journey to and from dog shows. In his statutory notice of deficiency, respondent determined that petitioners' expenses in connection with their dog breeding activities were incurred for activities not engaged in for profit for the taxable years in question.Accordingly, he disallowed petitioners' losses on such activities under the authority of section 183. [4] Additionally, respondent determined that the deduction of $126 shown on petitioners' 1976 income tax return for general sales tax on furniture is not allowable because of petitioners' use of the optional state sales tax tables to compute their deduction. *723 Respondent also determined that petitioners were liable for an addition to tax for 1976 and 1977 pursuant to section 6651(a) for failure to file a timely return for the years in question. OPINION The principal issue before us is whether petitioners' dog breeding and showing activities constituted activities "not engaged in for profit" within the meaning of section 183 for the tax years in question. If we find as such, then petitioners are not entitled to deduct the losses incurred in 1976, 1977 and 1978 as a result of these activities relating to their dogs. Respondent contends that petitioners' dog breeding and showing activities were not primarily motivated by hopes of profit. In support of this contention, respondent relies on the unbusinesslike manner in which the activities have been conducted, the failure of petitioners to investigate fully the profit potential of the activities, the long history of losses incurred by petitioners, and the fact that petitioners had other income from full-time occupations with which the dog breeding activities could be maintained. Petitioners, of course, contend that they entered into the activities with the objective of making a profit *724 and that they still expect to make a profit. Section 183(a) provides that no deduction attributable to an activity not engaged in for profit shall be allowed except as provided in section 183(b). Section 183(b) essentially states that losses in excess of income are disallowed with respect to such an activity. The term "activity not engaged in for profit" is defined by section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Thus, if an expense with respect to an activity is otherwise deductible under either section 162 or section 212(1) or (2), then it is not subject to the disallowance provisions of section 183(b). The essential test for determining whether expenses are attributable to either carrying on a trade or business for purposes of section 162 or the production or collection of income under section 212(1) or (2) is whether the taxpayer's primary or dominant motive in conducting the activity was to make a profit. Godfrey v. Commissioner,335 F.2d 82, 84 (6th Cir. 1964), *725 affg. a Memorandum Opinion of this Court; Jasionowski v. Commissioner,66 T.C. 312, 319 (1976). The taxpayer's profit objective need not be a reasonable one but it must be in good faith. Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Benz v. Commissioner,63 T.C. 375, 383 (1974). Accordingly, in this case we must decide whether petitioners' primary objective for conducting their dog breeding and showing activities was to make a profit. In this regard, the burden of proof is on the petitioners to show that respondent's determination that the activities were not engaged in for profit is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Although ultimately we are deciding subjective intent, such intent is to be ascertained from objective standards. Indeed, the legislative history surrounding section 183 indicates that one of the prime motivating factors behind its passage was the desire by Congress to create *726 an objective standard for determining whether a taxpayer was carrying on a business for the purpose of realizing a profit or was merely attempting to create and utilize losses to offset other income. S. Rept. No. 91-552, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 423, 489-490; Jasionowski v. Commissioner,supra at 321. Thus, in making our determination, objective facts are entitled to more weight than mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.
In this regard, the Commissioner promulgated regulations under section 183 which set forth nine separate factors which should be examined along with all the other facts and circumstances in making a determination of whether an activity is engaged in for profit. Sec. 1.183-2(b), Income Tax Regs.Jasionowski v. Commissioner,supra at 320; Benz v. Commissioner,supra. Briefly stated, the nine relevant factors are: (1) manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer *727 or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. The regulations further provide that no one factor is conclusive; therefore, we do not make our decision by simply counting the factors which support either party's position. Of the factors listed, we will discuss only those with particular relevance to the instant case. The first factor we consider is the manner in which the taxpayer conducts the activity. The regulations provide that the fact that the taxpayer carries on the activity in question in a businesslike manner and keeps a complete and accurate set of books and records indicates that the activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. *728 Although petitioners did set up a separate bank account under the name of Lizan Kennels and incurred expenses for some commercial items such as advertising and professional handlers, they failed to maintain a separate set of books and records on their dog breeding and showing activities. Admittedly, petitioners' cancelled checks might serve as adequate substantiation for claimed expenses; however, they definitely do not represent businesslike recordkeeping. Furthermore, petitioners neglected to keep track of the expenses attributable to each individual dog they owned during the years in question. We have previously held that the failure to maintain detailed records adequate to determine the profitability of each dog implies a lack of interest in whether an activity is profitable. [5] We therefore find that petitioners failed to operate their dog breeding and showing activities in a businesslike manner overall. A second factor of particular relevance in the instant case is the expertise of the taxpayer or his advisors *729 in the activity.Although petitioner James Steele possesses a master's degree in Dairy Science with a major in animal breeding and was involved with chimpanzee and monkey breeding as an employee of Gulf South Research Institute, there is absolutely no indication that he or his spouse had any training or experience with respect to managing dog kennels. It is true that petitioners conducted a "little feasibility study" prior to commencing their dog breeding activities; however, this study consisted of merely talking to several dog breeders personally. There is no evidence that petitioners ever consulted or employed any commercial or kennel experts in an attempt to make their dog breeding activities commercially profitable. Furthermore, although James Steele estimated from his study that his dog breeding activities would become profitable in the third year if everything went according to his calculations, there is no evidence that petitioners made any serious effort to insure that things developed according to those calculations. [6] We thus believe that this factor also indicates that petitioners' dog breeding activities were not engaged in for profit. *730 A third factor that indicates an absence of the required profit motive is the history of losses sustained by petitioners. With respect to this factor, section 1.183-2(b)(6), Income Tax Regs., states: A series of losses during the initial or startup stage of an activity may not necessarily be an indication that the activity is not engaged in for profit. However, where losses continue to be sustained beyond the period which customarily is necessary to bring the operation to profitable status such continued losses, if not explainable, as due to customary business risks or reverses, may be indicative that the activity is not being engaged in for profit. * * * Petitioners have experienced losses in their dog breeding and showing activities for the tax years 1971 through 1980. Petitioner James Steele had anticipated losses during the first 2 years; however, he stated that he expected to begin showing a profit in the third and fourth years and that subsequent years would be very profitable. Obviously, this has not been the case since petitioners have sustained *731 losses for an uninterrupted period of 10 years. In analyzing petitioners' history of losses, we find the numbers for 1976--the sixth year in which petitioners claimed to be in the dog breeding business--particularly illuminating. In that year, petitioners realized a paltry $25 of income from their dog breeding and showing activities. By contrast, the deductions claimed by petitioners for that year totaled $7,268.46. This type of discrepancy in income and expense amounts is certainly not indicative of the presence of the requisite profit objective.
Furthermore, dog breeding is not the type of highly speculative activity in which the hope for a large profit down the road justifies substantial losses over an extended length of time. As we stated in Bessenyey v. Commissioner,45 T.C. 261 (1965), affd. 379 F.2d 252 (2d Cir.), cert. denied 389 U.S. 931 (1967): "[T]he goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile *732 been sustained in the intervening years." 45 T.C. at 274. Thus, it is not sufficient that petitioners' objective was to someday make a profit from their dog breeding activities; profit sufficient to recoup their prior losses must be anticipated. We do not believe that petitioners possessed this necessary objective. After all, during the years 1971 through 1980 petitioners claimed losses from their dog breeding and showing activities totaling $52,636.80. In contrast, petitioners' gross income from such activities over the same period of time was less than $4,000. In point of fact, petitioners had already claimed losses of $29,000 prior to the tax years in question. It seems inconceivable that they could have recouped those losses much less make an overall profit from their dog breeding and showing activities. To adapt a phrase, a taxpayer need not be an incorrigible pessimist with respect to his profit-making prospects, but he does have to keep his head out of the sand. Other factors relevant to the instant case are the petitioners' financial status and the elements of personal pleasure or recreation derived from their dog breeding activities. During the years *733 in question, petitioners had substantial income from other sources so that their claimed losses from their dog breeding activities generated substantial tax benefits.Although this factor is not determinative in and of itself, it lends additional support to respondent's argument that petitioners' dog breeding activities were not entered into for profit.
Finally, section 1.183-2(b)(9), Income Tax Regs., makes it clear that, although it is not necessary that an activity be engaged in for the exclusive intention of deriving a profit, the presence of personal motives in the carrying on of an activity may indicate the lack of the requisite profit objective. In this regard, it is obvious that the breeding and showing of dogs is an activity which possesses substantial recreational aspects. [7] Thus, this is another factor which weighs against petitioners. *734 In summary, although we empathize with petitioners' plight since they have obviously suffered a great deal of misfortune in their dog breeding activities, after carefully considering all the facts and circumstances we must conclude that these activities were not primarily motivated by hopes of profit. Thus, we hold that petitioners' dog breeding and showing activities were "not engaged in for profit" within the meaning of section 183. [8] Accordingly, respondent's determination that the losses from petitioners' dog breeding and showing activities are not allowable deductions is sustained. *735 With respect to the sales tax deduction of $126 which was disallowed by respondent, petitioners have failed to introduce any evidence which supports such deduction. Petitioners have the burden of proof to show that respondent's determinations are in error. Welch v. Helvering,supra;Rule 142(a), Tax Court Rules of Practice and Procedure. Since petitioners have failed to carry their burden of proving that they were properly entitled to the claimed deduction, respondent's determination must be sustained. [9]
The final issue is whether petitioners are liable for the addition to tax pursuant to section 6651(a) for 1976 and 1977. Section 6651(a) provides for an addition to tax for failure to file a timely *736 return unless such failure was due to reasonable cause and not due to willful neglect.Petitioners have offered no evidence whatsoever explaining why they were delinquent in filing their returns for the years in question. Because they bear the burden of proving that they are not liable for the addition, we must sustain respondent. Neubecker v. Commissioner,65 T.C. 577, 586 (1975). Decision will be entered for the respondent.
Footnotes
1. James R. Steele actually testified that they owned four Afghans during 1976.However, it is stipulated that one of these dogs, Dic-Mar's Lady in Blue of Lizan (Lady), was sold in 1974.↩
2. It is unclear when petitioners lost Sissy. James R. Steele testified that she was put to sleep in 1977. However, it is stipulated in the facts that she was put to sleep in 1975 or 1976.↩
3. There seems to be some discrepancy as to when petitioners actually acquired Snow. Although Mr. Steele testified that he was purchased in 1978, the opinion of the prior trial, Steele v. Commissioner,T.C. Memo. 1981-118↩, reported that he was acquired by petitioners in 1975.
4. Alternatively, respondent determined in his notice of deficiency that, if it is determined that petitioners' dog breeding activities were engaged in for profit, petitioners' loss from such activities for the taxable year 1978 should be reduced to $3,758.57.↩
5. Ballich v. Commissioner,T.C. Memo. 1978-497↩.
6. We have previously stated that "A study ignored is no better than a nonexistent study." Steele v. Commissioner,supra.↩
7. Steele v. Commissioner,supra n. 3; Ballich v. Commissioner,T.C. Memo. 1979-497; Imbesi v. Commissioner,T.C. Memo. 1964-276, affd. in part, vacated and remanded in part 361 F.2d 640↩ (3d Cir. 1966).
8. In reaching this conclusion, we note the fact that petitioners have previously litigated this same issue for the years 1974 and 1975 in this Court.In our opinion in the prior case, Steele v. Commissioner,supra,↩ we reached the conclusion that petitioners' dog breeding and showing activities were not engaged in for profit. At trial in the instant case, when asked what facts existed in the years in question which did not exist in 1974 and 1975, James Steele replied "probably none." Unfortunately for petitioners, this is one contention with which we are indeed inclined to agree.
9. It should be noted that even if petitioners had introduced evidence proving that the claimed deduction was actually paid, they still would not be entitled to a deduction for such amount unless they could show that they paid sales tax during 1976 in excess of the amount allowed by respondent. See Russo v. Commissioner,T.C. Memo. 1982-248↩.