Marie L. JOHNSON and William P. Johnson, Representative of the Estate of William J. Johnson, Deceased, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 310–84T.

United States Claims Court.

Sept. 26, 1986.

Henry G. Zapruder, Washington, D.C., for plaintiffs; Roger A. Pies, David J. Fischer and Morgan, Lewis & Bockius, of counsel.

Charles Bricken, Washington, D.C., with whom was Asst. Atty. Gen. Roger M. Olsen, for defendant; Mildred L. Seidman and Donald H. Olson, of counsel.

## OPINION

MAYER, Judge.

The questions presented in this case are whether the transaction for the sale and leaseback of computer equipment is a "sham" for tax purposes, and whether it qualifies under section 183 of the Internal Revenue Code of 1954 as an activity engaged in for profit.

### Background

During the years 1979–81, plaintiffs William J. and Marie L. Johnson were married and residing in Goshen, Indiana. On January 2, 1986, William J. Johnson died and his estate was substituted as co-plaintiff. Nevertheless, and because Marie L. Johnson is a party only because she signed joint income tax returns with him, William J. Johnson is referred to as plaintiff in this opinion.

Prior to 1979, plaintiff was the sole shareholder and chief operating officer of Goshen Rubber Company, Inc. (Goshen Rubber), and its subsidiaries, which manufactured rubber seals and related articles sold primarily to the automobile industry. In the mid–1970's, William P. Johnson (Johnson), plaintiff's son, succeeded his father as president of Goshen Rubber. He has an undergraduate degree in accounting from the University of Notre Dame and earned a law degree from Stanford University. Plaintiff remained chairman of the board of directors of Goshen Rubber during the years at issue, 1979, 1980, and 1981.

For some time before 1979, Johnson had handled investments on behalf of plaintiff. He was authorized to, and did, act on plaintiff's behalf in the transaction (Transaction) which is the subject of this suit pursuant to a power of attorney. Therefore, at trial the court ruled that the analysis, intent, motives, conclusions, and discretionary actions of Johnson toward the Transaction are to be imputed to plaintiff.

In 1978, St. Joseph Equity Corporation (Equity), St. Joseph Leasing Corporation (Leasing), and St. Joseph Lease Capital Corporation (Capital), were organized by Michael V. Jennings and St. Joseph Agency, Inc., now known as St. Joseph Bancorporation, Inc. (St. Jo Parent). St. Jo Parent is a publicly owned bank holding company related through holdings of common stock to St. Joseph Bank and Trust Company of South Bend, Indiana (St. Jo Bank). St. Jo Parent owned 51 percent of Capital, and the remaining 49 percent was owned beneficially by Jennings. Equity and Leasing were wholly owned subsidiaries of Capital. Jennings was president of Capital, Leasing, and Equity during the years at issue and acted on behalf of Equity and Leasing in the Transaction. (Capital is no longer a subsidiary of St. Jo Parent. Jennings acquired 100 percent beneficial ownership in December of 1983.)

Johnson was on the board of directors of St. Jo Parent during 1979, had been on the board when the decision to form Capital was made, and was aware of the general nature of Equity's business. The business

of Equity and Leasing was third-party computer equipment leasing, such as the one giving rise to this suit. Jennings, the holder of a Master of Business Administration degree from Harvard University, was experienced in this business.

In the fall of 1979, Johnson, plaintiff's son, became interested in investing in computer equipment on behalf of Goshen Rubber, plaintiff, or himself. Accordingly, he arranged to meet with Jennings in South Bend. They met on October 23, 1979, and discussed the terms of a purchase and leaseback of computer equipment through Equity. Johnson prepared and brought questions to ask Jennings, and added the responses to his notes. During the meeting, Jennings gave Johnson copies of two pro forma projections representing the cash flow and effect of hypothetical purchases and leasebacks of computer equipment through Equity. He explained that the equipment was already on lease to either TRW, Inc., or Standard Oil Company of Indiana. And he informed Johnson that for a transaction to break even after the eight year term of the lease, the equipment must have a residual value of 4.8 percent of the purchase price.

The next day, October 24, 1979, Jennings met with representatives of Price Waterhouse at Johnson's request. At the meeting, he explained the proposed transactions based on his hypothetical pro forma projections and answered questions raised by the Price Waterhouse representatives. Price Waterhouse is a national accounting firm with offices in South Bend, Indiana, and was the accountant for Goshen Rubber, plaintiff, and Johnson. Price Waterhouse personnel at the meeting included George Davin, Richard Corbin, and Thomas Kuchta. Davin was the audit and engagement partner for Goshen Rubber, Johnson, and plaintiff. As audit partner, he was principally responsible for the preparation and accuracy of financial statements for Goshen Rubber. As engagement partner, he was ultimately responsible for all advice given to Goshen Rubber, Johnson, or plaintiff on any matters. Corbin was the audit manager on the Goshen Rubber account.

Kuchta was the senior tax partner for the South Bend office and the tax partner for Goshen Rubber, Johnson, and plaintiff; he was responsible for advising Johnson about the transactions proposed for both plaintiff and Goshen Rubber, of which, more below.

As a follow-up to these meetings, Jennings wrote a letter to Johnson on October 30, 1979, containing a projection illustrating the financial effect of a proposed purchase of computer equipment by Goshen Rubber (Goshen Transaction), assuming a purchase price of $2,160,000. Copies of the letter and projection were also sent to Kuchta and Davin.

On November 6, 1979, Johnson again met with Jennings and discussed the proposed Goshen Transaction. Robert Alexander, vice president of finance for Goshen Rubber, Davin, Kuchta, and Corbin were also present. Immediately after the meeting, Johnson discussed the matter separately with Alexander, Davin, Kuchta, and Corbin. He took notes of this meeting, which reflect that he asked whether the two Transactions, plaintiff's and Goshen Rubber's, were legal "tax shelters." His advisors informed him that they were legal if they promised a potential gain apart from the tax benefits. But by consensus, they doubted that the amount of equipment subject to the proposed Goshen Transaction was sufficient. Corbin was assigned to obtain information about the type, quality, cost, and potential residual value of the equipment, and to persuade Jennings to add more equipment.

Remarketing of the equipment upon termination of the Transactions was also discussed. Both the possibility of having Jennings, who often provided this service to his clients, remarket, and of Goshen Rubber remarketing in the event the equipment had high residual value, were considered. Goshen Rubber was not in the business of leasing computer equipment, but it used computers in its business and had sold equipment it no longer needed.

After discussion, the group concluded that the Transaction would be suitable for

plaintiff if it was found to be suitable for Goshen Rubber. It was not suitable for Johnson because, although the economics would be the same, the tax deferral aspects would not be as beneficial for him as for the other two.

Finally, they decided that only peripheral equipment, preferably current-production disk drives, not central processing units, should be purchased. Marketing experts in the computer industry generally agreed that over time peripheral computer equipment was more likely than central processing units to retain high values relative to then-current IBM list prices. Johnson had previously consulted with Paul Hertzler, Goshen Rubber's vice president for management information systems, on this point. His advice paralleled that of the Price Waterhouse executives. Hertzler had analyzed price trends and made notes in the July 1979 *Computer Price Guide, The Blue Book of Used Computer Prices* (*Computer Price Guide* or *Guide*), and had reviewed his findings with Johnson. In his discussions with Price Waterhouse and with Jennings, Johnson was informed that the principal tax benefit associated with purchasing and leasing computer equipment was the tax deferral that, over the term of the enterprise, would result in deductions in excess of income in the initial years, and income in excess of deductions in later years. The projections set out by Equity illustrated this prospect.

Following the November 6, 1979, meetings, Corbin consulted with David Ludvigson and Timothy Bremer to gather information about the cost and likely residual value of the proposed Goshen Rubber equipment. Ludvigson and Bremer were members of the staff of the Management Advisory Services (MAS) division of Price Waterhouse. The MAS division consulted with the other divisions and with clients of Price Waterhouse about data processing and other high technology matters. Consultation with MAS was standard procedure at Price Waterhouse, and its members relied on the division for valuation expertise. Ludvigson and Bremer regularly advised clients whether to lease or buy computer equipment, as well as on the types and quantities of equipment most suitable. Because of his expertise, Ludvigson's opinion on the present and future value of computer equipment was frequently sought.

As a result of MAS research, Corbin learned that the IBM 3350 Disk Storage Device was the top of the production line of IBM disk storage devices in 1979. He was directed to three sources for determining their value: A publication by Data Pro Research Corporation, a publication by Computer Merchants, Inc., and IBM. Data Pro Research Corporation publishes a loose-leaf service which includes concise descriptive information about IBM computer equipment, as well as computer equipment available from other manufacturers. The MAS division maintained a copy of this service. Computer Merchants, Inc., publishes the *Computer Price Guide*, a quarterly pamphlet. The MAS division had a copy of the current *Computer Price Guide*, and used the October 1979 issue for evaluating the Transactions. Ludvigson and Bremer assisted Corbin in obtaining the cost and residual value information from these sources. Bremer also secured price quotes for IBM equipment directly from IBM, and gave them to Corbin.

From the information provided him, Corbin determined that IBM's then current list price for the equipment in the proposed sale and leaseback between Equity and Goshen Rubber, was $1,458,000. Equity, however, proposed to sell the equipment for $2,160,000. So he advised Johnson that more equipment should be added to the Goshen Transaction before it could be considered viable.

Ludvigson and Bremer told Corbin that their best estimate of residual value for IBM 3350 disk drives at the end of an eight-year lease was 10 to 15 percent of the IBM new list price in effect at the time. They also said that, due to possible rapid technological change, the residual value could be as low as 5 percent, although the 10 to 15 percent estimate may be more

reasonable in light of the high quality maintenance program for the equipment.

The October 1979 issue of the *Computer Price Guide* showed that the used market price for IBM models in the same series as those in the proposed Transaction was approximately 80 percent of IBM's new list price at that time. Some of this information is reflected in Corbin's working papers, the first draft of which was prepared November 8, 1979. He relayed the relevant information, including equipment cost and residual value estimates, orally to Johnson.

Sometime prior to November 16, 1979, Charles Barnato, Price Waterhouse tax manager for the accounts of Goshen Rubber, Johnson, and plaintiff, told Jennings the amount of money plaintiff would be willing to invest. Barnato and Douglas Warrick, a Price Waterhouse staff member who assisted him, prepared a projection of the proposed Transaction using slightly different assumptions than those used by Equity. Barnato assumed that plaintiff's marginal income tax bracket would be in part estimated actual rates and in part 60 percent, not the 70 percent used in the Equity projection, and that the Transaction price would be $350,000. He also prepared projections of plaintiff's "pre-shelter" taxable income and his federal income taxes, showing the effect of an "equipment leasing tax-shelter." Barnato sent the three projections he prepared to Johnson under a cover letter dated November 15, 1979.

Equity prepared a projected profit and loss statement for a transaction by plaintiff assuming a purchase price of $365,000, similar in form to the projection that Equity provided for the Goshen Transaction. Jennings gave this projection to Johnson at or before the time he sent Johnson the documents used to effect the Transaction.

Johnson and Jennings understood that plaintiff's Transaction would be on the same terms as the Goshen Transaction and would have the same kind of equipment, IBM 3350 disk drives, but would involve less money. Subject only to these constraints, Jennings selected the equipment that plaintiff would purchase. The Transaction was, in fact, documented in form and substance along the same lines as the Goshen Transaction. Because the two Transactions proceeded in tandem on similar terms, considerations pertinent to one of them were treated as pertinent to both. Testimony reflected the parity of reasoning between the Transactions. IBM's list price for plaintiff's equipment as new was $327,180. The ratio of the Transaction purchase price of $365,000 to the new list price was 111.56 percent, approximately the same ratio as in the Goshen Transaction.

Equity prepared the documents necessary to effect the two Transactions. They were sent to Johnson with a letter dated November 16, 1979, which showed that Jennings had added equipment to the Goshen Transaction so that the aggregate new list price for the equipment was $1,929,030. Corbin calculated the new list price for the Goshen equipment at $1,938,600. The price at which Goshen Rubber was to purchase the equipment was $2,160,000, or 111.97 percent of IBM's new list price as calculated by Equity, and 111.42 percent of that new list price as calculated by Corbin.

Jennings sent copies of his November 16 letter and the accompanying documents to Price Waterhouse. Corbin reviewed the Transaction documents, concluded that they reflected the agreed terms, and so informed Johnson. The documents were also reviewed and approved by Frank Yoder, counsel to Goshen Rubber, on or about November 29, 1979.

Neither Johnson nor Price Waterhouse tried to determine whether a comparable purchase and leaseback transaction was available from another vendor at a lower price relative to the list price of the equipment. Johnson did not engage an outside appraiser to determine whether the price represented fair market value for the equipment or to verify the residual value projection. Before the Transaction closed, neither he nor Price Waterhouse tried to determine whether the rents payable by Equity for either plaintiff's equipment or the Goshen equipment were comparable to

rents for similarly leased equipment. And neither Johnson nor Price Waterhouse negotiated with Equity over the term of the lease; it was part of the package and remained the same from start to finish. Johnson and Price Waterhouse based their analysis of the Transactions on Equity's pro forma projections, Equity's Transaction-specific projection, the projections prepared by Price Waterhouse enclosed in the November 15, 1979, letter, and the materials enclosed in the November 16, 1979, letter. There was no prospectus or other written description of the proposed Transactions. Johnson executed the Transaction documents on behalf of plaintiff, and the Goshen Transaction documents as president on behalf of Goshen Rubber Leasing Company, Inc., a wholly owned subsidiary of Goshen Rubber formed November 14, 1979, for the purpose of entering into the Goshen Transaction, between November 30 and December 6, 1979.

The Transaction equipment was part of a larger lease portfolio that Equity acquired from Leasing, which had previously acquired it from Standard Oil of Indiana. Standard Oil had leased the equipment directly from IBM but, around August 29, 1979, it agreed to purchase it for $956,940, IBM's then list price. Part of the purchase price was payable with Accrued Purchase Option Credits by which a portion of earlier equipment rental costs were applied against the purchase price. The cash portion of the sale, $510,720 including sales tax, was paid to IBM by Leasing. IBM transferred the equipment to Standard Oil, which in turn transferred title to Leasing, and leased the equipment back from Leasing pursuant to the terms of a Master Lease Agreement (Master Lease).

The equipment ultimately sold to plaintiff was 34.2 percent of the equipment that Standard Oil sold to Leasing. The remainder of the equipment on the Master Lease, together with other equipment similarly acquired by Leasing and Equity from TRW, was purchased by Goshen Rubber Leasing in the Goshen Transaction. Leasing financed its purchase of equipment from Standard Oil with a loan from Indiana National Bank; it granted a security interest in the equipment and in its interest as lessor under the Master Lease to St. Jo Bank as agent for Indiana National Bank.

On November 16, 1979, Leasing sold the equipment it had acquired from Standard Oil to Equity for $525,696, $510,720 plus $14,976 profit, and assigned Equity its interest as lessor under the Master Lease, both subject to the security interest of St. Jo Bank. The six IBM 3350 model A2F disk drives, each with the string switch feature 8150, shown on the Master Lease are what plaintiff purchased. Under the terms of a purchase agreement, plaintiff bought the equipment from Equity for $365,000, which he paid with a recourse promissory note to Equity for $55,000, the "equity" portion, and a nonrecourse installment note in the amount of $310,000. The promissory note was payable in five annual installments of unequal amounts, including principal and interest. He executed a security agreement, a bill of sale, a lease back to Equity (Equity Lease), several assignments and other documents.

The payments plaintiff owed Equity under the installment note were $4,988.50 per month for 96 months. Simultaneously, he leased the equipment back to Equity for the same 96 months at an agreed monthly rental of $5,171.83 under the Equity Lease. The difference between the rental and installment note payments netted a monthly "cash flow" to plaintiff of $133.33, or approximately $2,200 a year for eight years. Every six months plaintiff received payments from Equity of about $1,100 representing the "net rentals," the difference between payments due under the Equity Lease and his payments on the installment note. In the event of default by Equity in its payments, plaintiff did not have recourse against its other assets. The purpose of this nonrecourse provision was to memorialize the understanding of the parties that Standard Oil, and not Equity, was ultimately the source of the rents payable under the Lease. Plaintiff gave Equity a security interest in the equipment and assigned it his interest in the Equity Lease

and the Master Lease as security for payment of the installment note. When the equipment was sold to plaintiff, it remained "subleased," together with other equipment, to Standard Oil under the Master Lease, the primary term of which was five years. The Master Lease could be terminated after two years upon payment of a lump sum. Aggregate rentals payable by Standard Oil under the Master Lease over its primary five year term were enough to repay Leasing's acquisition financing, with interest.

Paragraph Five of the purchase agreement between Equity and plaintiff provided that Equity would be paid a remarketing fee for its services if it arranged a lease or sale of the equipment on behalf of plaintiff at the end of the Lease. The remarketing fee was 50 percent of the proceeds from a lease or sale in excess of plaintiff's remaining net investment in the equipment. The "remaining net investment" is defined as the cash down payment and original promissory note principal balance, less cash payments made to plaintiff during or after the term of the lease. Plaintiff's "remaining net investment" would be $37,400.32, and no remarketing fee is payable until he recovers that amount.

Remarketing services are defined in the purchase agreement as including renewal rentals payable under the Equity Lease, purchase of the equipment by Equity, or referral by Equity of a willing lessee or buyer for the equipment at its then fair rental or market value. The fee is not payable if someone other than Equity arranges a sale or lease of the equipment, but the purchase agreement gives Equity or any buyer or lessee referred by Equity a right of first refusal for 20 days to buy or lease the equipment on the same terms as a buyer or lessee not referred by Equity.

Price Waterhouse advised plaintiff to execute later amendments to the $310,000 nonrecourse installment note so that he would be "at risk" for purposes of section 465 of the Internal Revenue Code of 1954, 26 U.S.C. § 465. Plaintiff was aware that his deductions from the Transaction could not exceed the amount of equity and recourse debt for which he was personally liable. Accordingly, he agreed that in each year following, an installment note amendment would be executed to increase the recourse portion of his debt on the Transaction.* On December 18, 1980, plaintiff executed an installment note amendment increasing his personal liability to $60,689 of the outstanding balance, and on December 31, 1981, he increased it to $106,621.

For the tax years 1979, 1980, and 1981, plaintiff's claimed deductions from the Transaction exceeded Transaction generated income. Defendant disallowed the excess of deductions over income from the Transaction and assessed deficiencies and interest for those years, which plaintiff paid. He then filed amended tax returns for those years, claiming refunds of taxes paid because of the Transaction, which were denied. This suit premised on 28 U.S.C. § 1491(a)(1) followed. The case is now before the court after trial. The only issues left for trial were whether the Transaction was a "sham," and whether it fell within the contemplation of section 183 of the Code, 26 U.S.C. § 183, so as to foreclose the associated deductions plaintiff claims for the years in contention.**

---

\* Defendant challenged the agreement to amend the installment note as unenforceable, either because of the absence of consideration or because it violates the state statute of frauds, Va. Code § 11–2 (1950). The court does not decide that question because it is part and parcel of the question of whether plaintiff was "at risk" in the investment, an issue withdrawn by defendant. See n. **, *infra.*

\*\* Other issues fell away in the pretrial phase. Defendant initially relied heavily on the argument that plaintiff could not prevail, even if the

Transaction survived scrutiny as a sham or under section 183, because it also ran afoul of the "at risk" requirements of Code section 465, 26 U.S.C. § 465. Defendant presented a series of discrete reasons why this is so. It is not necessary to address them here, however, because just before trial it withdrew all its arguments under section 465, "without conceding the applicability of Section 465 to plaintiff's transaction. . . ." Plaintiff acquiesced, and the court ruled "without adjudication of the question on the merits, that for purposes of this trial plaintiff's at risk investment, within the meaning of

## Discussion

### 1. *Economic Substance*

The "sham transaction" or economic substance test is used to deny effect to transactions designed to manufacture tax benefits without affecting the economic circumstances of the parties involved. It looks through the form of a transaction to its substance to determine if a real transaction has occurred. The most complete Court of Claims statement of the standard is in *Rothschild v. United States*, 407 F.2d 404, 408, 186 Ct.Cl. 709 (1969), where, after reviewing some sham transaction cases, the court observed:

> It is quite obvious in the above cases that the court was looking to the substance of the transaction, without any regard for the tax consequences. Its only interest was to determine whether the transaction was a sham. In doing so, the court viewed the nature of the transaction in its entirety to determine whether there was any significance to what the parties did or whether the total transaction placed the parties in the same position they previously occupied in such a manner so as to call the transaction a sham.

According to this observation, the transaction survives as long as it is not false or fraudulent. There is no question that our Transaction was what it purported to be, a sale of equipment to plaintiff and a lease of that equipment back to Equity. Defendant's view is that it should not be respected for tax purposes because it had no business purpose; it could realize no economic gain apart from tax benefits. This is the so called economic substance requirement also necessary to sustain a transaction for tax purposes. *Cf. Rothchild*, 407 F.2d at 408, 417.

Over the years the sham inquiry has been refined. Recently, *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir.1985), articulated a precise test. "To treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possibility of a profit exists." *See Frank Lyon Co. v. United States*, 435 U.S. 561, 583, 98 S.Ct. 1291, 1303, 55 L.Ed.2d 550 (1978). As can be seen, this requires a subjective business purpose or an objective possibility of profit. This precision is desirable, and does not conflict with *Rothschild*; it simply clarifies what must be shown to sustain a business transaction for tax purposes.

The parties agree that the possibility of a mere "modicum" of profit will satisfy the "economic substance" test. Plaintiff says if that is found here, he should prevail without more; no greater profit motive or prospect of profit is needed to also satisfy section 183 of the Code. Defendant counters that successfully negotiating the "sham" hurdle is only the beginning. Plaintiff must also prove his primary or dominant motive was to make a reasonable profit, not to enjoy tax advantages. Something more than a modicum of profit, apart from tax benefits, is necessary. Otherwise, he will not satisfy the profit requirement of section 183, and his deductions will be limited to the amount by which income generated by the investment exceeds certain items, such as interest and taxes, for which deductions are allowed. He will not be permitted to offset non-investment income. The court sees the dividing line as different from both of those postulations.

### 2. *Section 183*

Section 183 permits only limited deductions for "activities not engaged in for profit," in circumstances where deductions would otherwise not be allowed. Activities engaged in for profit are outside the ambit

---

section 465, as of the end of the December 31, 1979, 1980, and 1981 years, exceeds the amount of the deductions claimed by plaintiff with respect to the investment for each of the taxable years." The court also ruled that neither party could ask the court to make findings on any issue that either could or would be inconsistent with the order on the at risk investment. To permit this could lead to conflicting conclusions on different issues at trial.

of section 183. Activity not engaged in for profit is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable" under sections 162 or 212. Therefore, to determine what constitutes an activity engaged in for profit, from which deductions may be applied to offset income from other sources, consideration of sections 162 and 212 is helpful.

■ Historically, most cases addressing the issue of whether an activity is engaged in for profit have arisen in the "hobby loss" area. In those cases courts decided whether an activity was a business, by definition engaged in for profit, *see, e.g., Hirsch v. Commissioner,* 315 F.2d 731, 736 (9th Cir.1963), for which section 162 permits deductions for expenses, or an activity pursued for personal pleasure, for which deductions are not allowed. *See also, e.g., Wrightsman v. United States,* 428 F.2d 1316, 1320, 192 Ct.Cl. 722 (1970) (deductions under section 212 dependent on activity entered into primarily for production of income or managing income producing property). In light of section 162, *Eastman v. United States,* 635 F.2d 833, 837, 225 Ct.Cl. 298 (Ct.Cl.1980), said section 183 requires a primary profit motive.

The test for determining whether an activity is engaged in for profit is whether the individual engaged in the activity with the primary purpose of making a profit; if the activity is carried on for personal or family recreation and the taxpayer does not show an overriding profit motivation, no deduction will be allowed. This test expressly applies to the "hobby loss" situation. *See also Monfore v. United States,* 214 Ct.Cl. 705, 720 (1977); *Patterson v. United States,* 459 F.2d 487, 493, 198 Ct.Cl. 543 (1972). However, the degree of profit motive required in a non-"hobby loss," pure business transaction, is a matter of first impression in this court.

In the Tax Court, however, a line of section 183 cases holding that a primary or dominant profit motive is required to satisfy section 183 in a business transaction where no "hobby loss" element is present

has emerged. *See, e.g., Jaros v. Commissioner,* T.C.M. (P–H) ¶ 85,031 (1985); *Lemmen v. Commissioner,* 77 T.C. 1326, 1340, 1346 (1981); *Hager v. Commissioner,* 76 T.C. 759, 784 (1981). Even though section 183 was enacted to prevent "hobby loss" deductions, the statutory language is not so confined, and the Tax Court has rejected arguments that it be so limited. *See Jaros,* ¶ 85,031 at 85–141 n. 10. On the other hand, it has not been consistent in this view. *Estate of Baron v. Commissioner,* 83 T.C. 542, 558 (1984), *aff'd,* 798 F.2d 65 (2d Cir.1986), objected to the primary profit objective test and used an "intermediate" test instead, in which it balanced the profit against the tax benefits received. *See also Fox v. Commissioner,* 82 T.C. 1001, 1021 (1984) (primarily for profit standard relaxed where congressionally encouraged transactions are involved).

■ Other factors, however, suggest that a primary or dominant standard is not appropriate in the business setting. Neither section 183 nor the Treasury regulations issued under it require a primary or dominant profit motive, and it appears this requirement evolved from a "judicial gloss," unsupported by express statutory language. *Cf. Fox,* 82 T.C. at 1019. Moreover, Revenue Procedure 75–21, 1975–1 C.B. 715, the guideline on equipment leasing transactions, also does not require a dominant profit motive. Plaintiff concededly does not meet all its requirements, but the level of profit motivation required by this guideline is minimal. It is satisfied if the lessor "expects to receive a profit from the transaction, apart from the value of or benefits obtained from the tax deductions, allowances, credits and other tax attributes arising from such transaction." *Id.* at 716. A net economic profit and a "reasonable" cash flow, according to section 4(6) of the Revenue Procedure, meet this test. *Id.* Despite the opportunity, defendant has not set out a primary or dominant profit motive requirement.

The only equipment leasing cases brought to the court's attention did not use a section 183 analysis. Both *Rice's Toyota*

*World, Inc. v. Commissioner,* 81 T.C. 184 (1983), *aff'd in part, rev'd in part,* 752 F.2d 89 (4th Cir.1985), and *Estate of Thomas v. Commissioner,* 84 T.C. 412 (1985), were examined only under an economic substance test, and therefore a primary profit motive was not required. Section 183 does not apply to corporations other than S corporations, but a primary profit motive test under section 162 might have been applied against the corporate plaintiff in *Rice's Toyota* if it had survived the sham challenge. Section 183 was available in *Thomas,* however, but apparently was not argued. *See* 84 T.C. at 438 n. 45. These cases, of course, do not say that section 183 is inapplicable to an equipment leasing transaction. But the fair implication is that the profit requirement of section 183 is not applied to equipment leasing transactions with the same vigor as to "hobby loss" activities.

In the line of "hobby loss" cases culminating in *Eastman,* the Court of Claims required "a primary purpose of making a profit." 635 F.2d at 837. In *Trustees of Graceland Cemetery Improvement Fund v. United States,* 515 F.2d 763, 206 Ct.Cl. 609 (1975), however, the court confined the profit requirement of section 162 to the "hobby loss" area. "The profit factor is really only significant insofar as it is a means of distinguishing between an enterprise carried on in good faith as a 'trade or business' and an enterprise carried on merely as a hobby...." *Id.* at 778. That is not to say that no profit at all is required under section 183; the statute says "for profit." But, *Graceland Cemetery* teaches that the predominant profit motive cases under section 162 have importance only in the "hobby loss" context, and do not control in a business situation like plaintiff's.

Earlier, in *Knetsch v. United States,* 348 F.2d 932, 939, 172 Ct.Cl. 378 (1965), the Court of Claims denied taxpayers a refund for expenses incurred in a disallowed tax shelter investment because the "only motivating factor was the tax deduction." This suggests that some, arguably even a slight, profit motive, in addition to tax motives, will sustain tax deductions. *Knetsch* ad-dressed section 165(c)(2), but its reasoning informs our consideration of section 183.

On the whole, the preceding discussion supports a profit motive requirement less than predominant under section 183. *Graceland Cemetery* limits the "primary" requirement to the "hobby loss" situation. And in the face of *Baron, Fox,* and Rev. Proc. 75–21, cases like *Jaros* and *Hager,* applying the "primary or dominant" test to business transactions, are not persuasive. Economic and tax motives regularly operate side by side to influence business transactions, and it would be unfair and contrary to the realities of the marketplace to apply a "primary or dominant" test to them. *Baron* recognizes this, and *Thomas,* by ignoring section 183, at least implicitly questions whether the full force of that section applies to substantive equipment leasing transactions. Profit motive cannot be totally ignored, but the *Baron* approach is more salutary because it is in line with the profit requirement of Rev.Proc. 75–21, and more accurately accommodates the economic realities of true business transactions.

While *Baron* looks in the right direction, its analysis is not useful in all its ramifications. Under its "intermediate" test, the court balanced the taxpayer's profit against what it saw as excessive potential tax benefits, and concluded that the "requisite profit objective" was not present. 83 T.C. at 558. But in applying a "profit" test under section 183, potential tax benefits should not be considered. Weighing of tax benefits properly occurs under the at risk rules of section 465, the congressionally sanctioned tool for limiting deductions. So long as deductions do not exceed the amount the taxpayer is at risk in the activity, those in excess of income generated by the activity may be applied against other income. *Baron* mixes section 465 considerations with the "profit" test; to that extent, its analysis is not helpful.

On the other hand, something more than the modicum necessary to survive a finding of sham is called for, contrary to plaintiff's

position. In the absence of guidance, it is logical that a profit reasonable in the circumstances should be anticipated to pass muster under section 183. This should allow sufficient flexibility to address the varying configurations transactions under section 183 might assume.

The question of how profit motivation is determined is answered by Treasury Regulation § 1.183–2(a). It states a test that is primarily objective, resting on an evaluation of all facts and circumstances. "The determination whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case.... In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of intent." *See Hager*, 76 T.C. at 784.

■■■ Accordingly, as announced in the pretrial order, the standard for applying section 183 to the Transaction, free, as it is, from personal or "hobby loss" considerations, is as follows: The profit requirement of section 162 [and section 212], as incorporated by reference in section 183(c), is satisfied by demonstrating that the Transaction was engaged in with the objective of, and a reasonable chance of making, a reasonable profit apart from tax considerations. A primary or dominant profit motive is not required, but more than the "modicum" of profit necessary to avoid a finding of a "sham transaction" is necessary. Determination of plaintiff's objective requires consideration of all the facts and circumstances, with greater weight given to objective factors than to subjective ones. Determination of a "reasonable profit" requires consideration of all the facts and circumstances, including comparable transactions and the state of the industry during the years at issue.

Demonstration that "the Transaction was engaged in with the objective of, and a reasonable chance of making ... more than the 'modicum' of profit necessary to avoid a finding of a 'sham transaction' ..." will concurrently satisfy the sham transaction

standard. Therefore, this discussion is directed solely to section 183.

Section 183(c) declares that the term "activity not engaged in for profit" means any activity for which deductions under sections 162 and 212 are not allowed. By Treas.Reg. § 1.183–2(b), the Internal Revenue Service has established the following factors for assessing an activity for profit orientation.

(1) Manner in which the taxpayer carries on the activity.

(2) The expertise of the taxpayer or his advisors.

(3) The time and effort expended by the taxpayer in carrying on the activity.

(4) Expectation that assets used in the activity may appreciate in value.

(5) The success of the taxpayer in carrying on other similar or dissimilar activities.

(6) The taxpayer's history of income or losses with respect to the activity.

(7) The amount of occasional profits, if any, which are earned.

(8) The financial status of the taxpayer.

(9) Elements of personal pleasure or recreation.

No one factor is determinative in assessing the profit orientation. Nor are these the only factors to be considered. A determination is not made "on the basis that the number of factors (whether or not listed in [Treas.Reg. § 1.183–2(b)]) indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or visa versa." Treas.Reg. § 1.183–2(b).

a. *Background and Conduct*

In evaluating whether plaintiff had an objective of making a profit, the court evaluated Johnson's actions and conduct before he executed the Transaction documents, *see* Treas.Reg. § 1.183–2(b)(1), (2), and his previous success in other activities, both similar and dissimilar. *Id.* § 1.183–2(b)(5). It appears that Johnson acted with due regard for the Transaction's profit potential by maintaining complete and accurate business records, competently investigating

and assessing the profitability of the Transaction, and acting according to reasonable business practices.

Johnson's conduct and the expertise of his advisors is quite unlike that of the taxpayers and their advisors in other tax shelter cases. *See, e.g., Sutton v. Commissioner*, 84 T.C. 210 (1985), *aff'd*, 788 F.2d 695; 791 F.2d 1506 (11th Cir.1986); *Estate of Baron*, 83 T.C. 542; *Brannen v. Commissioner*, 78 T.C. 471 (1982), *aff'd*, 722 F.2d 695 (11th Cir.1984). Indeed, the taxpayers and their advisors in *Sutton, Baron,* and *Brannen* had little or no experience with the underlying industry generating the investments, and lacked knowledge and training in their alleged areas of expertise. *See Sutton*, 84 T.C. at 214, 224; *Baron*, 83 T.C. at 555; *Brannen*, 78 T.C. at 472, 511. In *Baron* the court found any investigative efforts were "mere window dressing to conceal tax motives." 83 T.C. at 555. The plaintiff had a *"complete* absence of contact" with the investment or the personnel responsible for its management, showing indifference to the success or failure of the venture. *Id.* at 560. *See also, Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1245 (1981).

By contrast, Johnson approached this investment with the kind of caution expected of a prudent businessman. As president of Goshen Rubber, he was familiar with computer equipment, having personally participated in the leasing and purchasing of computer systems for the company since the early 1960's. He had also played a lead role in other investment decisions of the company including the acquisition of smaller companies, airplanes, and plant facilities. He was sufficiently educated and experienced to evaluate the Transaction in a businesslike manner.

Johnson knew Jennings because of Jennings' participation with St. Jo Parent in the formation and operation of Equity and Leasing. Despite his knowledge of Jennings' business background and reputation, Johnson nevertheless engaged in personal efforts to research the Transaction. He interviewed Jennings and took notes about the mechanics and motivations behind a lease and purchase transaction, the economic risks from the perspective of both lessor and lessee, the importance of residual value in making the Transaction profitable, and the tax benefits and burdens associated with the Transaction. At this meeting, Jennings presented Johnson with projection spread sheets (pro forma sheets) analyzing the various cash flows, debt, and tax liabilities attendant upon the Transaction.

Johnson then had his accountants from Price Waterhouse review and analyze the pro forma sheets as well as interview Jennings on two occasions. Afterward, he had Price Waterhouse provide him an independent analysis of the economic, tax, and legal aspects of the Transaction. In addition, Price Waterhouse's MAS division worked up an assessment of the residual values and the remarketing potential for different types of computer components. Johnson also had the Goshen Rubber vice president for finance review the proposed Transaction.

Price Waterhouse endorsed the Goshen Transaction, provided that more equipment was added at no additional cost to increase the residual value potential. Upon reviewing his accountants' recommendations, Johnson agreed to the Transaction and the Goshen Transaction, after Jennings included the additional equipment in both.

Johnson monitored the investment. His accountants sent him memoranda on two occasions, apprising him of the current resale value of the equipment. He also had periodic conversations with Jennings about the investment after the November 1979 closing. These efforts appear consistent with the actions of a prudent profit oriented investor. The competence of his advisors is unchallenged on this record. In view of Johnson's background and experience, his conduct was sufficient, and conformed to acceptable business standards. *See* Treas.Reg. § 1.183–2(b)(1), (2), (5).

Defendant contends, however, that Johnson's testimony at trial and a letter sent to him by Jennings demonstrate that tax ben-

efits were plaintiff's primary objective. At trial Johnson testified that he "was looking for an investment that would reduce [Goshen Rubber's] tax bite and [provide] additional cash or flow of funds to use in other investments and expansion." And, describing the financing of the Goshen Transaction in the October 30, 1979, letter to Johnson, Jennings said,

> [Equity] make[s] [the financing] available to you in order that your investment can be funded completely from your actual deferred federal and state income taxes. You will note in the Investment Analysis Section that you have the use of up to $360,000 of tax savings through 1984 and that your actual risk posture in the equipment at the end of eight years is only $51,140.

■ This evidence is indicative of a tax deferral, if not tax avoidance, motivation, but it is not dispositive of the absence of the requisite profit objective. Johnson further testified that he was looking to structure the Transaction "not only as a source of funds," but also as "a great or lucrative business opportunity," which meant, "a chance to make a profit" by "resell[ing] the equipment at a much higher point than the break even indicated in the pro formas or the spreadsheets...." He added that Price Waterhouse "would not recommend the deal if it was only on a break even basis or if there was no chance to make a profit." Kuchta of Price Waterhouse confirmed this testimony. Furthermore, Jennings' letter mentioned the tax aspects as a means of generating "further profit from [the] investment" so long as the residual value of the equipment held up.

When viewed in context, the remarks of Johnson and Kuchta, and Jennings' letter, buttress plaintiff's profit seeking motivations and expectations. Johnson's concern with tax benefits apart from his demonstrated profit seeking objective is an economic reality in the business world. *See Commissioner v. Brown,* 380 U.S. 563, 579, 85 S.Ct. 1162, 1171, 14 L.Ed.2d 75 (1965) (Harlan, J., concurring). "The fact that favorable tax consequences were tak-

en into account by [plaintiff] on entering into the transaction is no reason for disallowing those consequences. We cannot ignore the reality that the tax laws affect the shape of nearly every business transaction." *Frank Lyon Co. v. United States,* 435 U.S. 561, 580, 98 S.Ct. 1291, 1302, 55 L.Ed.2d 550 (1978).

b. *Purchase Price*

Defendant contends plaintiff paid significantly more than fair market value for the equipment as a means of securing additional interest and depreciation deductions. Plaintiff bought six IBM 3350 Model A2F disk drives, each with the 8150 string switch feature. IBM's new list price for the equipment was $327,180. The used market prices reflected in the October 1979 issue of the *Computer Price Guide* for Models A2 and B2 of the 3350 disk drive series were 82 and 78 percent of IBM's new list price, respectively. A2Fs were not listed. Plaintiff paid $365,000 for the six drives in the lease portfolio, which was 111.56 percent of IBM's new list price, and 139.45 percent of the price of the used equipment listed in the *Guide.* The parties acknowledge that the *Computer Price Guide* is an authoritative source for assessing the availability and prices of used computer components.

Defendant says the fair market value of the six 3350 A2F drives at the time of the Transaction was the extrapolated used price of 80 percent of the original list price. It contends that the equipment should be considered used because it was already installed and in use in November of 1979, when the Transaction was executed.

Defendant's expert at trial, Dee Morgan, testified that she assumed that a used 3350 Model A2F disk drive would sell for the same percentage of its new list price, 80 percent, as did the related models shown in the October 1979 issue of the *Guide.* One of plaintiff's expert witnesses, Frederick Withington, testified that he would have made the same assumption. Despite the absence of the A2F from the *Guide,* however, Morgan testified that she assumed

that the A2F was available on the used market. She based her assumption on three things. First, an advertisement in a trade paper from November 1979, that she attached to her report, listed the A2 and B2 for sale, but not the A2F. Second, she said she remembered having seen another advertisement which indicated that used A2Fs were available in December of 1978, almost a year before the Transaction took place. And sometime in May or June of 1985, Morgan spoke to a computer salesman by telephone who claimed to remember that the A2F was available used in November of 1979.

The court is unpersuaded. Contrary to Morgan's assumption, the evidence shows that IBM 3350 Model A2F disk drives were not trading in the used market in 1979 in significant numbers, if at all. Her assumption was based primarily on the memory of a person not present at trial, and on her own memory of an advertising flier from seven years before. Despite Morgan's reliance on the *Guide* for her used price calculations, she ignored the significance of the A2F's absence from the October 1979 issue.

Another of plaintiff's experts, Svend Hartmann, has been the editor of the *Computer Price Guide* since 1970. He testified that the compilers of the *Guide* regularly receive information from over 100 dealers around the country. Hartmann stated that he had contact with personnel at several large used computer dealerships. He also had close contact with most of the approximately 250 members of the Computer Dealers and Lessors Association and, in seeking information for the *Guide*, talked to more than half of those people at one time or another.

Hartmann said that if he had had any information about trading in used A2F disk drives in significant volume, he would have included it in the *Guide*. He noted that his organization closely monitored the 3350 market because the other models were already trading in large enough volume to be listed. In fact, the A2F did not even make it into the "poor availability" classification,

the lowest of the three categories of availability carried by the *Guide*. It did not appear in the *Guide* until 1981.

More importantly, transactions in the used market are not comparable to the Transaction here. Purchases in the used market involve acquiring disconnected equipment of unknown previous use and condition from a warehouse. The user is changing. The equipment is not under IBM warranty or an IBM maintenance agreement and consequently may not perform after reinstallation, or qualify for IBM maintenance.

In contrast, this Transaction is more akin to a new equipment purchase. The used market is irrelevant. Because A2Fs were not trading, the only source of this equipment for one seeking to assemble a similar package would have been IBM. Whether new or reconditioned, IBM would have sold it at new list price. It is unlikely that a "blue chip" user like Standard Oil would have been willing to accept anything less, even if the items could have been found on the used market. This assumes it would have substituted any other equipment for that which it already had, a tenuous proposition. Even Morgan agreed that IBM was the only source if the used market had been inadequate, which it was, but incongruously she also said anyone buying used equipment from IBM at list would have paid more than fair market value. Of course, this was an investment; plaintiff was not in the business of buying and packaging computer equipment for lease. There is no requirement that he have scoured the used market, and there is no comparison between him and those who did. Therefore, the IBM new list price is the appropriate starting point for assessing the fair market value of the Transaction.

Defendant also asserted that an end-user of this highly specialized disk drive might be willing to buy a used Model A2F for a price equal to or greater than the new list price, given the unavailability of the A2F in the used market. However, because plaintiff is a passive investor in leased equipment, defendant saw no reason why he

would be willing to pay a premium over fair market value for a used Model A2F, much less a premium over the price of a new one.

This argument overlooks a major factor in lease transactions. Plaintiff paid not only for equipment, but for Equity's efforts in finding a sub-lessee; acquisition and installation of the equipment under an IBM maintenance policy; negotiation of the lease terms with the sub-lessee, Standard Oil; arranging financing and legal services; and developing knowledge of the business. The IBM maintenance program is significant because it insures high reliability and performance of the equipment which protects its resale or residual value. All of these services were provided plaintiff by Jennings at Equity. Johnson did not want to get into the leasing business and do all this himself.

The value of these services was recognized by all of the experts, but Morgan did not believe they warranted any payment. However, she also had no experience with third party equipment leases. Plaintiff's expert, Hartmann, on the other hand, testified that the cost of services normally appears in the leasing business as a premium in the range of 5 to 15 percent over the price of the equipment. The premium also accounts for what is known in the industry as the inertia effect, the tendency of users to keep equipment on lease beyond the term of ·the lease, even when it is obsolete in the used market. All of the experts acknowledged this factor as well.

Equity also financed plaintiff's investment at an annual 12 percent interest, 3½ points below the then current prime rate. IBM generally provided financing at one point above prime on direct equipment purchases. Jennings testified that "the higher the interest rate, the lower the actual market value of the debt instruments." In this case, "[i]f [Jennings] had adjusted [plaintiff's] borrowing rate of 12 percent to a market rate of 15.5, his purchase price would have been on the order of magnitude of $328,000 not $365,000," a price difference of approximately 11 percent. The

IBM list price for plaintiff's equipment of $327,180, a lease premium that could reasonably go as high as 15 percent, and favorable financing, resulted in a Transaction price that was only 11.56 percent over list at $365,000. So plaintiff purchased this lease portfolio at a price that did not exceed its fair market value.

■ *Siegel v. Commissioner*, 78 T.C. 659, 690 (1982); *Brannen*, 78 T.C. at 498; and *Hager*, 76 T.C. at 775–81, support this conclusion. In all three cases, the Tax Court found that the purchase price of petitioner's investment, including nonrecourse obligations, exceeded its fair market value by a minimum of 200 to 300 percent. In *Brannen* and *Hager*, this overvaluation significantly contributed to the court's decision that the petitioners' activities were not engaged in for profit. *See Brannen*, 83 T.C. at 508, 512; *Hager*, 76 T.C. at 788. *Siegel* denied the claimed deductions in excess of the investment's fair market value; because of other factors, however, the owner of the investment was still found to be engaged in it for profit. 78 T.C. at 704. Here, no overvaluation problem exists.

c. *Profitability*

To assess whether plaintiff engaged in the Transaction with "a reasonable chance of making a reasonable profit apart from tax considerations," the cash flow of the Transaction must be considered. *See* Treas.Reg. § 1.183–2(b)(6), (7). The parties disagree over how the court should characterize the lease payments, the remarketing fee, and the residual value, and there is conflicting testimony from the experts as well. Defendant also says plaintiff has not provided evidence of comparable transactions because it would show that his lease payments are proof of a lack of profitability in the investment. To fill this alleged void, defendant suggests the court look at the Master Lease between Leasing and Standard Oil.

The Leasing/Standard Oil rents covered all of Leasing's loan payments to Indiana National Bank with about 5 percent per month overage. At the end of the five-

year primary term of the Master lease, Leasing would have owned the equipment free and clear, if it had not been sold to plaintiff. Then, if Standard Oil renewed for three additional years, Leasing would accrue pre-tax profit of $84,419.28. Plaintiff, on the other hand, has a $52,400 pre-tax loss after eight years of leasing to Equity. Defendant contends that the disparity between the two transactions shows that plaintiff's was not typical in the industry and its negative profit return demonstrates that he had no prospect of a reasonable profit.

This analysis fails for three reasons. First, the Leasing/Standard Oil transaction is not comparable to plaintiff's. Neither the purchase price nor the rental payments were at fair market value. The Leasing purchase from Standard Oil included the use of IBM Accrued Purchase Option Credits. The profit margin in the transaction can be attributed to Jenning's services as lessor to Standard Oil. Plaintiff, as lessor to Equity, and a passive investor, has not provided comparable services.

Second, Jennings testified without contradiction that his transactions were conservative in comparison to others at the time because they were structured to provide significant cash flow, thereby reducing tax benefits and the investor's dependence on residual value, while other transactions went forward with higher tax benefits and no cash flow. His had smaller tax benefits and lower down payments than did similar transactions, which typically were nine or ten year sales and leasebacks of equipment. And his were not designed to inflate tax benefits through rent deferrals, step rents, or other devices used by others. Hartmann confirmed that the rents paid by plaintiff were fair and reasonable.

 Third, *Estate of Thomas,* 84 T.C. 412, considered a transaction structured similarly to ours. For example, plaintiff's initial equity of $55,000 here represented 15 percent of the equipment's total cost of $365,000; in *Thomas* the taxpayer's initial equity investment was 13 percent. 84 T.C. at 436. In both cases, the lease terms were

eight years, and the computers were expected to have useful lives of two to three years beyond lease termination. *Id.* The purchase price of the lease portfolios in both transactions equaled their fair market value. *Id.* at 422, 436 n. 41. And the leases were "net leases" which are "a form commonly used in the industry." *Id.* at 424. *Thomas,* of course, was an economic substance case, but an outcome favorable to the taxpayer would have occurred under section 183, as well. *See Id.* at 438 n. 45. In light of this, the leasing and financing arrangements of plaintiff's Transaction were reasonable and in line with transactions typical of the computer leasing industry.

A major factor in evaluating the economic feasibility of the Transaction is the residual (re-sale or re-leasing) value of the equipment at the end of the lease. The residual value of the equipment represents a significant portion of the Transaction's pre-tax profitability. *See, e.g., Rice's Toyota World, Inc.,* 752 F.2d at 92, 94; *Estate of Thomas,* 84 T.C. at 416. At trial, Withington and Franklin Fisher testified as expert witnesses on residual value for plaintiffs, and Morgan testified for defendant.

Mindful that the opinions of experts "can be no better than the soundness of the reasons that stand in support of them," *Fehrs v. United States,* 620 F.2d 255, 265, 223 Ct.Cl. 488 (1980), the court considered that its

> task is to determine the credibility of any lay or expert witness based upon objective facts, the reasonableness of the testimony, the consistency of the statements made by the witness, and, in some cases, the demeanor of the witness. In the present case, as in the ordinary case, any doubts about the reliability of an expert's testimony are based on the failure of the facts to support his assumptions and his ultimate opinion rather than any doubt as to whether the expert is expressing a truthful opinion.

*Estate of Gallo v. Commissioner,* 50 T.C.M. (CCH) 470, 484 (1985). The experts'

projections of residual value in 1987 from the perspective of November 1979 were:

| | |
|---|---|
| Withington | $81,795 to $130,872 |
| Fisher | $52,925 to $ 98,208 |
| Morgan | $ -0- to $ 12,000 |

Since 1960, Withington has worked for Arthur D. Little, Inc., a well known consulting firm based in Cambridge, Massachusetts. He specializes in the computer and data processing industry, and has performed studies in this area for over 200 clients. Since 1964, he has been responsible for an annual Arthur D. Little report that assesses and forecasts the computer and data processing industries. Withington has written four books and thirty-one articles and papers on information processing subjects, and has served as a visiting professor at the Harvard Business School. He is the only expert in this case who has testified for both plaintiffs and the government in other trials.

Withington submitted a report that was based on one written primarily in November of 1979. The earlier report was prepared for the Defense Intelligence Agency to assess the technological trends of the data processing industry and residual values of IBM equipment. The updated version here reflected very little hindsight which enhanced its credibility. His methodology involved projecting future changes in technology, including the rate of change within a particular product technology; forecasting IBM product development and product introduction, which involved assessing the performance, capacity and cost effectiveness of past and present IBM products; and, from the preceding information, forecasting the future market price of an existing model.

This analytical approach was sound and his sources of information were diverse and numerous, which accounts for his comprehensive and credible testimony. Indeed, he meticulously explained how previous IBM pricing patterns and product life cycles alone should not be the basis of a prediction, but that end-user demands, such as the previously discussed inertia factor,

must also be evaluated in any residual projection.

Fisher was employed by IBM for 28 years. While there, he worked in sales, field engineering, product planning and development, and market research, receiving many corporate and division awards. He performed many product "impact" studies for different IBM disk drives. These studies measured the effect of the introduction of new products on the residual value or price of older ones. In 1980, he started his own consulting firm, which consists mostly of IBM retirees, and provides a variety of data processing services.

Although his report was written in 1982, the analytical approach was the same as when he performed impact studies in 1979 for the 3350 and other disk drives. His methodology involved measuring the rate of change of capacity, performance, and reliability of disk drives; analyzing demand for current IBM products and those of competitors, which also required measuring the inertia effect, or "delta trauma" as he called it; and looking at historical trends of IBM product cycles, and IBM pricing policies. Despite his inside experience with IBM and a report that includes some unfortunate hindsight, Fisher's intimate knowledge of IBM products, manufacturing, and marketing strategies, made him a credible witness. In fact, his methodology was similar to Withington's, took similar factors into account, and derived similar conclusions that formed the basis of his projected residual estimate.

Morgan has been involved with the computer industry since 1956, including 18 years at the General Services Administration (GSA) as a computer equipment analyst, systems coordinator and computer consultant. Since leaving GSA in October of 1983, she has provided consulting services and has testified as a government expert in several computer leasing tax shelter cases. Her report was prepared in April of 1985.

Morgan's methodology for determining the residual value of the equipment involved four steps: determining the econom-

ic useful life of prior IBM disk drives by looking at when they disappeared from the *Computer Price Guide;* computing the end of the economic useful life of the IBM 3350 disk drive by assuming it would last the same number of years as the prior disk drives she examined; drawing a freehand concave curve from 80 percent of the 1979 list price as of 1981 through zero at the end of 1989, the assumed end of the economic useful life, which resulted in a 5 percent residual value at the end of 1987; and applying 5 percent to the projected IBM list price in 1987.

This methodology rested on assumptions that Withington and Fisher refuted at trial. She assumed that the rate of change in disk drive technology was increasing, while both Fisher and Withington were unequivocal that disk drive technological developments were slowing down, and they explained why. Indeed, both Withington and Fisher highlighted the danger of Morgan's assumption, because the rate of change in technology greatly affects the economic useful life of disk drives and consequently their residual value. Morgan did not include price performance in her report, while Withington and Fisher specifically addressed this factor, and all three admitted its relevance.

Morgan's assumption about the useful life of the IBM 3350 was made without considering the timing or significance of the introduction of successive IBM disk drive generations. Fisher's testimony on this subject, based on information garnered from his insider position at IBM, but which he said was also available to astute outsiders, and submitted pages from the *Computer Price Guide*, undermined the validity of Morgan's assumption.

Other aspects of Morgan's presentation depreciated its value. Her freehand curve for deriving a residual value projection paled in comparison to Fisher's and especially Withington's more precise techniques. Her assumption that plug-in compatibles competed effectively against the 3350, and that IBM had ceased full scale manufacturing of 3350 disk drives in 1979, was shown to

be wrong by Fisher. She placed unjustifiable reliance on newspaper articles and the *Computer Price Guide* to derive the fair market value of the A2F in 1979. Morgan had unhelpful lapses in memory about her deposition testimony and prior testimony at other trials. And she failed even to read Withington's and Fisher's reports, which were available to her before she submitted her own.

 The court found the testimony of Withington and Fisher significantly more persuasive than Morgan's. Her suspect methodology and relatively shallow knowledge of the computer leasing industry scarcely challenged Withington's consistent, probative evidence, supported by Fisher. For all of that, of course, the court need not decide what the projected 1987 residual value would have been in 1979. It need only conclude, as it does, that in light of its comfortable fit within Withington's and Fisher's expert estimates, Johnson's projection of $80,000, or approximately 25 percent of the 1979 list price, was reasonable.

But defendant argues that Johnson embarked on the Transaction without those estimates. He had only the Price Waterhouse projection of 10 to 15 percent of the 1979 list price, or a dollar range of $32,718 to $49,077, with a downside projection of 5 percent, or $16,359. With this projection in hand, the investment could not have been expected to produce even the $52,400 necessary to cover the pre-tax loss at the end of eight years. Defendant submits that this proves Johnson could not have had a profit motive, nor could the investment have been expected to produce a reasonable profit based on the data then available.

The court rejects this argument. Johnson knew the Price Waterhouse estimate of residual value was conservative, and properly so. "Consistently with its goals and responsibilities, financial accounting has as its foundation the principle of conservatism, with its corollary that 'possible errors in measurement [should] be in the direction of understatement rather than

overstatement of net income and net assets.'" *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 542, 99 S.Ct. 773, 786, 58 L.Ed.2d 785 (1979). Corbin and Kuchta from Price Waterhouse reflected this conservative analytical approach to the investment in their testimony. The Price Waterhouse projection also ignored the $15,000 of interest on the initial equity note, as evidenced by its absence as a factor in determining when the remarketing fee went into operation. Furthermore, the projection was based on a Transaction price of $350,000, not $365,000, which would put the break-even point more within the range of defendant's figures. Price Waterhouse considered its projection to be an imprecise estimate.

Because Standard Oil was maintaining the equipment under an IBM service contract, Johnson not unreasonably assumed that the future residual value of his machines would be higher than for IBM 3350 disk drives of less conscientious users. And in 1979, double digit inflation still prevailed and Johnson thought it likely that inflation would mitigate the decline in the value of the equipment. As president of Goshen Rubber, he had seen this effect in other contexts.

Finally, Standard Oil had invested a lot of money in computer software and hardware. Because of the size of these financial commitments, Johnson assumed it would not be prone to change its equipment configuration, the "inertia" factor. Therefore, he anticipated that the equipment would hold its value because it had stayed with the original user.

Defendant proposes that as an alternative means of determining the economic viability of the Transaction, the court should discount the expected residual value of the equipment back to 1979 dollars. A similar suggestion was made in *Estate of Thomas*, and the court said,

> In the absence of statutory mandate, we decline to do so. While we are aware of our footnote 23 in *Hilton v. Commissioner*, 74 T.C. 305, 353 n. 23 (1980), *aff'd per curiam*, 671 F.2d 316 (9th Cir.1982),

> ... we note that the method employed there was dictum in the context of circumstances bordering on the egregious.

> Moreover, we do not feel competent, in the absence of legislative guidance, to require that a particular return must be expected before a "profit" is recognizable, the necessary conclusion to be drawn if we were to discount residual value.

84 T.C. at 440 n. 52. Therefore, the court is satisfied that Johnson's projected residual value of $80,000 or 25 percent of the November 1979 IBM list price was reasonable and predictive of a reasonable chance for a reasonable profit from the Transaction.

Defendant also charges that the pre-tax return on plaintiff's Transaction conclusively shows there was not a reasonable chance of making a profit. Assuming Equity did not exercise its right to remarket the equipment, plaintiff's receipt of the projected $80,000 residual would provide him with a pre-tax profit of $27,600, after subtracting the projected $52,400 tax loss. This represents a return of $3,450 per year, or a 6.27 percent per year pre-tax rate of return on an initial equity investment of $55,000. Defendant believes that when compared to the prime rate of interest at the time, 15.5 percent, this is not a reasonable profit. Because Johnson believed he could earn more than 6 percent after taxes, a profit maximizer would not invest money for a 6.27 percent pre-tax rate of return. Furthermore, if the remarketing fee is earned by Jennings, there would be only $6,300 in pre-tax profit at the end of the investment. This is an annual 1.43 percent return on the initial $55,000 investment. Defendant believes this return is miniscule compared to the tax benefits from the Transaction.

■ This reasoning is unpersuasive. Plaintiff must show "a reasonable chance of making a reasonable profit apart from tax considerations.... [M]ore than the 'modicum' of profit necessary to avoid a finding of a 'sham transaction' is necessary." Treas.Reg. § 1.183–2(b)(9) states,

It is not, however, necessary that an activity be engaged in with the exclusive intention of deriving a profit or with the intention of maximizing profits .... [T]he availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit.

Indeed, "[o]ur sole task here is to determine whether a profit was reasonably likely on these facts in order to find that tax avoidance was not the sole motivation for the transaction." *Estate of Thomas,* 84 T.C. at 440 n. 52. Plaintiff's annual return of 6.27 percent appears reasonably likely and is more than a modicum of profit.

The court disagrees that plaintiff had to assume Equity would exercise its right to remarket the equipment and take a remarketing fee which should be viewed as a charge against the residual value. Defendant premises this assertion upon the 20–day right of first refusal clause in the remarketing provision, and suggests that Jennings could earn the fee even though Johnson had not requested his help to remarket the equipment. Johnson thought this would be unethical, and trusted that Jennings would get the fee only if his services were requested. Johnson said he and Jennings had that understanding, and Jennings did not contradict him. Jennings viewed the provision as protection for the user, here Standard Oil, if it should want to continue with the equipment beyond the term of the lease in the face of an attempted sale to others. Otherwise, plaintiff could sell it or put it to use at Goshen Rubber without paying a fee. In these circumstances, it was not incumbent on plaintiff to treat payment of this fee as any more likely than not paying it.

Other factors also militated against Jennings taking a remarketing fee. He had only 20 days to exercise Equity's right of first refusal, which severely limits the available time to find and arrange for a buyer. And because of its relationship with St. Jo Parent, Equity was prohibited by Federal Reserve Board restrictions from purchasing the equipment for its own account. So the remarketing fee is merely a contingent risk that might reduce plaintiff's return on his investment, but need not be considered as more likely than not.

 All in all, plaintiff engaged in the Transaction with the objective of, and had a reasonable chance of making, a reasonable profit apart from tax considerations. This satisfies section 183. Because satisfying that section requires a more rigorous showing than necessary to surmount a finding of sham, that defense is also foreclosed.

Conclusion

Accordingly, plaintiff is entitled to prevail and by separate order judgment will be entered in his favor.